IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STI OILFIELD SERVICES, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:13-CV-02923** |
| | : | **(JUDGE MARIANI)** |
| **ACCESS MIDSTREAM** | : | |
| **PARTNERS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I.    Introduction

Presently before the Court is a Motion to Dismiss (Doc. 12), filed by the four

Defendants in this case: Access Midstream Partners, LP ("Access"), Appalachia Midstream

Services, LLC ("Appalachia"), Chesapeake Operating, Inc. ("COI"), and Chesapeake Energy

Corporation ("CEC").  The Motion seeks dismissal of Plaintiff's claims for Unjust Enrichment

(Counts II and VII), *Quantum Meruit* (Counts III and VIII), Promissory Estoppel (Counts IV

and IX), Fraud/Fraud in the Inducment (Count XI), and punitive damages.  For the reasons

discussed below, the Court will grant the Motion in part and deny it in part.

### II.    Factual Allegations and Procedural History

Plaintiff's Complaint alleges the following well-pleaded facts.  Plaintiff, STI Oilfield

Services ("STIOS") "is an oilfield and pipeline contractor whose primary focus is providing

oilfield and pipeline related services throughout the United States." (Compl., Doc. 1, at ¶ 9.)

In or about early November 2011, it entered into a Master Service Agreement ("MSA") with COI, for the purpose of becoming an approved vendor of COI's parent company, CEC. (*Id.* at ¶ 11.) Subsequently, "in January and May of 2012, respectively, CEC and/or its affiliate, COI, contracted with STIOS to perform certain pipeline improvements in Bradford County, Pennsylvania, more specifically identified as the Rome and Oilcan projects." (*Id.* at ¶ 12.) "STIOS dutifully performed its obligations under the contracts for the Rome and Oilcan projects by constructing the pipeline improvements as required . . . ." (*Id.* at ¶ 14.)

Plaintiff further alleges that, during this time, "Access, a separate and distinct entity from CEC and COI, contacted STIOS to request that STIOS provide proposals for the Projects being constructed by Access in Northeastern Pennsylvania," and that STIOS agreed to do so. (*Id.* at ¶¶ 16-17.) "[E]ach of these Projects was a separate component of a primary pipeline project being constructed within the northeast quadrant of the state of Pennsylvania . . . ." (*Id.* at ¶ 18.)

However, STIOS then alleges a series of problems related to the various Defendants' performance under the contract. These alleged problems caused damages in excess of two million dollars attributable to the Chesapeake Defendants (i.e., CEC and COI), (*see id.* at pp. 13-18), and in excess of forty million dollars attributable to the Access Defendants (i.e., Access and Appalachia), (*see id.* at pp. 19-26).

As to the Chesapeake Defendants, Plaintiff alleges that CEC and/or COI "agreed to pay for each time a work crew and related equipment needed to be moved from one work-

site to another (hereinafter the 'move-arounds')." (*Id.* at ¶ 13.) Not only did the Chesapeake Defendants not provide full payment for the work that STIOS "dutifully performed" for the Rome and Oilcan Projects, (*see id.* at ¶ 14), but it also "failed to pay STIOS for the complete amount owed for the move-arounds," (*see id.* at ¶ 15).

The allegations against the Access Defendants are more extensive. In general, STIOS alleges that it agreed to provide bids on the Access Projects "[b]ased upon numerous representations and warranties that were made to STIOS by Access." (*Id.* at ¶ 17.) However, the Access Defendants allegedly failed to live up to these representations and warranties.

The first of the Access Defendants' alleged failures relates to so-called "winter contingencies." While STIOS prepared proposals for the Access Projects, it determined that "a substantial percentage of the projects would be completed during the winter months." (*Id.* at ¶ 19.) "[I]n the northeast portion of the United States where the Projects were to be completed, completion of said pipeline projects during winter months generally involves issues that are outside of the norm for completion of pipeline projects generally, including issues arising out of or relating to frozen ground conditions." (*Id.* at ¶ 20.) Accordingly, "it is the general course and conduct of pipeline contactors . . . operating in the northeast quadrant of the United States where these particular projects were ongoing, to increase the standard rates in order to accommodate and account for winter contingencies." (*Id.* at ¶ 21.) "Alternatively, the owner and/or operator of a pipeline may request that the contractor

3

exclude winter contingencies in their bid processes in order to limit and/or control costs," in which case it is the industry practice that the risks of weather-related costs and delays are borne by the pipeline owner-operator and not the contractor. (*Id.* at ¶¶ 23-24.) Consistent with these practices, STIOS first submitted a set of bids to Access that incorporated the costs of winter contingencies. (*Id.* at ¶ 26.) However, upon receiving these proposals, Access representative Keith Edmonds instructed STIOS to resubmit its bids without the winter contingencies, informing it that Access was willing to accept the risk of winter-related costs and delays. (*Id.* at ¶¶ 27, 29.) In compliance with these instructions, STIOS submitted a second bid that excluded winter contingencies and, upon acceptance of the proposals by Access, began work on the various Projects. (*Id.* at ¶¶ 28, 30-31.)

"Almost immediately following the commencement of construction on the Projects . . . STIOS encountered substantial weather related delays and increased costs and expenses." (*Id.* at ¶ 32.) In reliance on Access's previous representations, STIOS then submitted a series of "change order requests" over the course of the months that it worked on the Projects to account for these costs and delays. (*See id.* at ¶¶ 37-39.) However, in September 2013, despite having been led to believe in the interim that the change order requests would be paid, "STIOS receive[d] notice that Access was contemplating denying virtually all of the weather related contingencies submitted by STIOS." (*See id.* at ¶¶ 49-

50.)[1]

Nor were STIOS's alleged costs limited to the weather itself. It further alleges that "in or around January of 2013, in recognition of the weather issues being encountered by STIOS, Appalachia, in conjunction with or on behalf of its affiliate, Access, issued a Winter Construction and Stabilization Plan . . . that substantially changed the specifications for winter work." (Id. at ¶ 34.) This change caused STIOS to incur "significant costs and expenses . . . including additional costs for, inter alia, snow removal, backfilling, and the provision of heating equipment and environmental material." (Id. at ¶ 35.) STIOS also allegedly incurred other unspecified non-weather-related "additional costs related to the performance of work arising on the field site that was outside the original contracts." (Id. at ¶ 36.) As with the winter contingencies, Access indicated that it would pay all of these extra costs throughout the course of STIOS's performance, but ultimately paid only an unacceptable lesser portion of them. (See id. at ¶¶ 38-41, 43-49, 57.) "Additionally, Access and/or Appalachia, without a basis in law or in fact, wrongfully retained a percentage of the monies to STIOS for the work that STIOS submitted for payment," which it never returned. (Id. at ¶ 42, 59.)

Finally, STIOS alleges that

Access, either individually or in concert with its authorized agents and representatives, issued a "work stoppage" that shut down all of the projects

---

[1] Other weather contingencies related to Hurricane Sandy remained under review for several months, but ultimately STIOS received notice that they "would be approved in substantial part, and paid." (Compl. at ¶¶ 51-52.) It is unclear from the pleadings if these payments were to Plaintiff's complete satisfaction.

involved in the entirety of the overall pipeline projects being completed in the northeast quadrant of the United States, including, but not limited to, the Projects being performed by STIOS.

    This "work stoppage" was purportedly due to safety issues associated with various contractors.

(*Id.* at ¶¶ 53-54.) The work stoppage was "improperly and unnecessarily" imposed on

STIOS, causing it "substantial additional costs." (*Id.* at ¶ 55.) STIOS submitted change

orders to Access for the additional costs related to the work stoppage, but these also

"received delayed treatment and analysis" and, ultimately, only a portion were approved.

(*Id.* at ¶¶ 56-57.)

    STIOS then filed a Complaint against the four Defendants. The Counts alleged

therein are roughly divisible into two parts: those alleged against the Chesapeake

Defendants and those against the Access Defendants. Against the former, STIOS alleges

Breach of Contract (Count I), Unjust Enrichment (Count II), *Quantum Meruit* (Count III),

Promissory Estoppel (Count IV), and Violation of Pennsylvania's Contractor and

Subcontractor Payment Act (Count V). It alleges these same causes of action against the

Access Defendants (Counts VI, VII, VIII, IX, and X, respectively), as well as a claim styled

"Fraud/Fraud in the Inducement" (Count XI), which includes a request for punitive damages,

(*see id.* at ¶ 118).

    In response, all four Defendants—who are jointly represented by the same

counsel—filed the instant Motion to Dismiss. That Motion does not attack the Breach of

Contract or Contractor Payment Act claims. Instead, it only argues for dismissal of all of the

6

quasi-contract claims, the fraud claim, and the request for punitive damages. Oral

argument was held on the Motion on April 23, 2014 and a follow-up conference call was

held on May 16 to discuss other issues raised at oral argument. Accordingly, the Motion is

now ripe for resolution. The Court therefore turns to a discussion of its merits.

## III.   Standard of Review

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it

does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need

detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement

to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of

action's elements will not do." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-1965 (internal

citations and alterations omitted). In other words, "[f]actual allegations must be enough to

raise a right to relief above the speculative level." *Id.* at 555, 127 S. Ct. at 1965. A court

"take[s] as true all the factual allegations in the Complaint and the reasonable inferences

that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare

recitals of the elements of a cause of action, supported by mere conclusory statements."

7

*Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231 n.14 (3d Cir. 2013)

(internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint:  First, the court must take note of the elements a plaintiff must plead to state a claim.  Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth.  Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged—but it has not show[n]—that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and

quotation marks omitted).  This "plausibility" determination will be a "context-specific task

that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

However, even if a "complaint is subject to a Rule 12(b)(6) dismissal, a district

court must permit a curative amendment unless such an amendment would be

inequitable or futile." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

> [E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

8

## IV.   Analysis

### a.  Quasi-Contract Claims

First, the Defendants argue that the claims for unjust enrichment, *quantum meruit*, and promissory estoppel must be dismissed, because these are quasi-contract claims which cannot be asserted when an express, written contract governs the relationship between the parties, as supposedly is the case here.

"Quasi-contracts, or contracts implied in law, are to be distinguished from express contracts . . . . Unlike true contracts, quasi-contracts are not based on the apparent intention of the parties to undertake the performances in question, nor are they promises. They are obligations created by law for reasons of justice." *Schott v. Westinghouse Elec. Corp.*, 259 A.2d 443, 449 (Pa. 1969) (internal quotation marks and alterations omitted). Therefore, "[b]y its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists." *Lackner v. Glosser*, 892 A.2d 21, 34 (Pa. Super. Ct. 2006) (citing *Mitchell v. Moore*, 729 A.2d 1200, 1203 (Pa. Super. Ct. 1999).

This law clearly demonstrates that, if an express or written agreement applies in the instant case, it would bar the three quasi-contract doctrines that STIOS asserts. *See, e.g., Mitchell*, 729 A.2d at 1203 ("[W]e may not make a finding of unjust enrichment . . . where a written or express contract between the parties exists.") (citing *First*

9

*Wisconsin Trust Co. v. Strausser*, 653 A.2d 688 (Pa. Super Ct. 1995)); *Ruby v. Abington Mem'l Hosp.*, 50 A.3d 128, 136 (Pa. Super. Ct. 2012) ("In Pennsylvania, the quasi-contractual doctrine of unjust enrichment (*quantum meruit*) does not apply when a written agreement or express contract exists between the parties. As the trial court noted, there is a written agreement in controversy in this matter . . . . Accordingly, a *quantum meruit* theory has no place in determining the rights of the parties in this action.") (internal citations omitted); *Iversen Baking Co., Inc. v. Weston Foods, Inc.*, 874 F. Supp. 96, 102 (E.D. Pa. 1995) ("[I]n Pennsylvania, a promissory estoppel claim can only exist in the absence of a contract. Courts have held that breach of contract and promissory estoppel may be pleaded in the alternative, but that if the court finds that a contract exists, the promissory estoppel claim must fall.") (collecting cases).

Accordingly, the Court must proceed to the question of whether an express or written contract existed between STIOS and each of the various Defendants.

### i. Chesapeake Defendants

Defendants have submitted to the Court a Master Service Agreement ("MSA") which is styled as being made between COI and any of COI's "present or future subsidiaries or affiliates" on one side and STIOS and its affiliates on the other. (*See* Master Service Agreement, Doc. 22-1, at p. 1.)

Though the MSA is not included in the Complaint, the Court may nonetheless take notice of it at the Motion to Dismiss stage. A "court may consider an undisputedly authentic

10

document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's

claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.,*

*Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Plaintiff's claims are clearly based on the

Agreement, as it is specifically alleged in paragraph 11 and relied on in the paragraphs that

follow. (*See* Compl. at ¶ 11 ("In or about early November of 2011, STIOS and COI, a

subsidiary of CEC, entered into a Master Service Agreement . . . for the purpose of

becoming an approved vendor for CEC.") The Court also finds that the Agreement's

authenticity is beyond reasonable dispute. Following oral argument, the Court ordered

Plaintiff to produce an affidavit swearing to its authenticity. (*See* Order, Apr. 24, 2014, Doc.

31, at ¶ 1.) Plaintiff responded with a sworn affidavit of one Jerrold Gill, President of STIOS.

(*See* Gill Aff., Doc. 32, at ¶ 1.) Gill averred—albeit evasively—that the Master Service

Agreement submitted "does not appear" to be a true and accurate copy of the parties'

agreement, but only on the grounds that it was missing "Exhibit B" of that agreement. (*Id.* at

¶ 3.) He does not, however, say whether the MSA is otherwise accurate. In this regard, it is

relevant that, Thomas Campenni, attorney for STIOS, stated on the record during oral

argument: "I'm saying that it [i.e., the Master Service Agreement] applies as to Chesapeake

Operating Incorporated, but it does not apply to the Access Defendant and the Appalachia

Defendant. That is our position," thus adopting the MSA as essentially authentic. (Official

Tr., Apr. 23, 2014, Doc. 36, at 15:16-18.) Perhaps most importantly, however, in a list of

documents that Gill's Affidavit states represent relevant "agreements between the parties,"

11

(*id.* at ¶ 7), Gill lists a document entitled "MSA," which was entered into between STIOS and

COI for both of the Chesapeake projects alleged in the Complaint and which is dated

October 27, 2011, (*see* Gill Aff., Ex. A, at pp. 5-6). October 27, 2011 is the same date that

the MSA submitted by Defendants was signed, by none other than Gill himself. (*See* MSA

at p. 25).[2] On the basis of all of these factors, the Court finds that the MSA is authentic and

that its substance is reasonably undisputed.

Given this finding, it is appropriate to look to the text of the MSA. It begins by

stating that it

> shall control and govern any and all performance of services and/or supply
> of materials and equipment by Contractor [STIOS] for Company [COI],
> under subsequent written purchase orders, work orders, supplemental
> agreements or oral instructions, hereinafter collectively called an "Order." .
> . . Agreements or stipulations in any such Order not in conformity with the
> terms and provisions hereof shall be null and void. No waiver by Company
> of any of the terms, provisions, or conditions hereof shall be effective
> unless said waiver shall be in writing and signed by an authorized officer of
> Company.

(MSA at ¶ 1.1.)

Accordingly, the relationship between STIOS and COI and CEC is governed by a

written Master Service Agreement, which, by its own terms, applies to "*any and all*

*performance of services*" and precludes other non-written agreements that contradict its

specific terms. Such an integrated written agreement thereby precludes claims for unjust

enrichment, *quantum meruit,* and promissory estoppel. And while, in general, quasi-

---

[2] Gill's Affidavit further swears that his signature in the MSA is authentic. (Gill Aff. at ¶ 6.)

contract claims can be pleaded alternatively, *see* Fed. R. Civ. P. 8(d)(2)-(3) (allowing "a party to set out 2 or more statements of a claim or defense alternatively or hypothetically" and to "state as many separate claims or defenses as it has, regardless of consistency"), it is clear here from the face of the Complaint and the documents properly considered along with it that a written agreement governs the action, thus making any alternative grounds for relief inapposite. When the Court accepts as true the existence of the undisputedly authentic MSA, the MSA acts to bar alternative theories of relief as a matter of law.

Therefore, Counts II, III, and IV must be dismissed from Plaintiff's Complaint. Though, ordinarily, such dismissal would be with leave to amend, the Court finds that allowing leave to amend in this case would be futile. The Court has already been provided with statements in a sworn affidavit by STIOS President Jerrold Gill and representations made on the record and in open court by Plaintiff's counsel Thomas Campenni that demonstrate that the Master Service Agreement applies to the dealings between STIOS and the Chesapeake Defendants. Accordingly, the only way the Complaint could be amended to salvage the quasi-contract claims would be if STIOS were to plead that these representations were inaccurate or misinformed. The Court, however, has no reason to doubt the sworn statements offered to it. Accordingly, Counts II, III, and IV are dismissed without leave to amend.

### ii. Access Defendants

The application of the quasi-contract claims to the Access Defendants is more

complicated. During oral argument, Plaintiff's counsel reiterated repeatedly that Plaintiff

insists that the Master Service Agreement only applies to the Chesapeake Defendants,

and not to the Access Defendants, who constitute a wholly different entity. (See Doc. 36

at 13:24-14:6, 15:2-18, 20:20-21:8, 22:10-19, 30:6-10, 31:6-9, 35:9-17.) This is

consistent with the pleadings, which allege that "Appalachia is an affiliate of Access,"

(Compl. at ¶ 4), but do not state any kind of legal relationship between the Access and

Chesapeake Defendants, and nowhere allege that STIOS entered into a written contract

with Access or Appalachia. Nor does the Master Service Agreement itself contain any

mention of the Access Defendants.

However, the Defendants also attached a document to their Reply Brief, entitled

"Instruction to BIDDERs," which contains Access's logo on the title page. (See

Instructions to Bidders, Doc. 22-2, at 1.)

The Court may also consider the Instructions to Bidders under Pension Benefit,

supra. STIOS relies in the Complaint on the fact that some instructions to bidders were

provided when it mentions the bidding process that it underwent with Access, as well as

"numerous representations and warranties" made in preparation of that process. (See

Compl. at ¶¶ 16-17.) Moreover, in oral argument, Defendants' Attorney David White first

asserted that these specific Instructions were authentic when he argued that they governed

14

the relationship between STIOS and Access. (*See* Doc. 36 at 9:2-11:6.) Attorney

Campenni for STIOS did not dispute the authenticity of the document, but only stated that

he was not sure "what the operative documents are." (*See id.* at 16:16-24.) Accordingly,

the Court ordered STIOS to verify the authenticity of the Instructions in the same Order

discussed above in relation to the Master Service Agreement. (*See* Doc. 31 at ¶ 2.) In a

similarly evasive response, Jerrold Gill replied that he was "uncertain whether the document

entitled 'Instructions to BIDDERs . . . is a true and correct copy of the instructions to bidders

pursuant to which Notices of Award for the [relevant projects were issued]." (Gill Aff. at ¶ 4.)

He elaborated: "The reason I am uncertain is that, while Access and/or Appalachia issued

documents entitled 'Instructions to Bidders,' there were multiple revisions of those

documents and Access and/or Appalachia provided these documents for each project and

in some instances, for each specific pipeline in a project." (*Id.*)

However, the Court's Order also instructed the responding party to "specify and

identify, by title, date, and identity of any and all contracting parties, any other written

agreement between Plaintiff and any one or more of the Defendants in this case. (Doc. 31

at ¶ 5.) Gill provided the Court with a list of documents which "can be considered to be

written agreements between the parties regarding the projects which are the subject of the

Complaint" and which list he "respectfully reserve[d] the right to amend . . . after the parties

in [*sic*] engage in discovery." (Doc. 32 at ¶ 7.) The documents that Gill lists that were made

between STIOS and Access are broken down by each specific project. (*See id.*, Ex. A.)

For each project, Gill lists only one document entitled "Instructions to Bidders."  Moreover, all of the other documents appear extraneous to the central agreement—for instance landowner agreements, purchase orders, and change orders—and would not supersede the Instructions to Bidders.

This means that, if there is a document in existence that modifies the Instructions to Bidders submitted to the Court, Plaintiff has not provided it, despite a Court Order to do so. Nor does Gill's statement in this regard that he will supplement his list after further discovery change the matter, because any binding agreement between STIOS and Access would almost certainly be in STIOS's possession, so it is unclear how further discovery could clarify the issue.  Gill's affidavit may therefore be considered a circuitous way of informing the Court that (a) an Instruction to Bidders packet was sent to STIOS by Access and (b) there is no reasonable basis to hold that the one submitted to the Court is not the Instructions binding in this case.  Therefore, the Court will consider it as undisputedly authentic under *Pension Benefit*.

Turning to the content of the Instructions to Bidders, it becomes clear that the Instructions are intended to form at least some part of a written contract.  The Instructions first define the term "Contract Documents" to "include all Bid Documents, Notice of Award, Notice to Proceed, executed agreements, Project Schedule, Project Drawings and any other written direction provided and agreed upon by both parties." (Instructions at 3.)  They further provide that "[t]he Instruction to Bidders document becomes a valid contractual

16

document once Company awards the scope of work and is accepted by the Bidder or Contractor." (*Id.* at 21.)

Relatedly, the Instructions list in Section 02.08, entitled "General Scope of Work," a series of documents that define the scope of work for which the bidder would contract. (*Id.* at 6-7.) These include a "Company/Contractor Master Service Agreement." (*Id.* at 6.) Immediately following this, the Instructions add parenthetically, "Contractor must have one in place." (*Id.* at 7.) Significantly, "Company" is defined in the Instructions as "Access Midstream Partners, L.P. *and Chesapeake Midstream Development* and/or its subsidiaries or affiliates." (*Id.* at 3 (emphasis added).) Therefore, even if STIOS never entered into any other agreements with the Access Defendants, under the express terms of Access's Instructions to Bidders, its relationship with Access would still be governed by the MSA that it undisputedly made with Chesapeake.[3] The Instructions to Bidders (which by their own terms, become contractual documents once scope of work is awarded and accepted), by clearly incorporating a separate written contract thereby preclude STIOS's quasi-contract claims, even if that separate written agreement was not actually signed by an Access representative.

In so concluding, the Court makes no impermissible findings of fact. Rather, it only

---

[3] The next question—i.e., whether the inclusion of this clause indicates that Access and Chesapeake are not separate companies as the pleadings claim—would require the Court to make findings of fact outside Plaintiff's Complaint and the documents properly considered along with it, and therefore cannot be answered at this stage. The Court only raises the relationship of Chesapeake and Access to show that, on the face of the documents considered under *Pension Benefit*, the Chesapeake Master Service Agreement has been incorporated into the allegedly separate agreement between STIOS and Access.

states that, when the Instructions to Bidders are accepted as authentic, STIOS becomes

bound by *some* written contract.  That may—but need not—be the Master Service

Agreement between STIOS and COI.  Because all that is necessary is "one" Master Service

Agreement between the contractor and *either* Access *or* Chesapeake, and because Jerrold

Gill admits that an MSA was in place between STIOS and COI, then Gill logically admits

that there was enough to satisfy the Instructions' contractual requirement of at least "one"

written MSA.  It may be that actually there was some second, as-yet-unknown MSA that

actually governs STIOS's agreement with Access.  But even if that were the case, it would

not change the fact that some MSA is in place.  And if there is no second MSA, then the

Chesapeake one would govern.  Either way, some written agreement controls the

relationship and bars STIOS's quasi-contract claims.  Counts VII, VIII, and IX must therefore

be dismissed.

Moreover, as before, granting leave to amend these quasi-contract claims would be

futile.  The Instructions to Bidders are undisputedly authentic: they have been submitted as

such to the Court and, despite being given the opportunity to do so, Jerrold Gill has failed to

dispute any of their material terms in any substantive way.  As such, their terms cannot be

modified through an amended complaint.  Because these terms at the very least incorporate

an MSA known to be in existence, then at least some MSA of necessity applies.  An

amended complaint could not change these facts.

18

### b. Fraud/Fraud in the Inducement

Defendants next seek to dismiss Count XI, styled "Fraud/Fraud in the Inducement." This Count is alleged against the Access Defendants only. It alleges that the Access Defendants "intentionally engaged in a pattern of fraud and deceit" when they told STIOS to modify its bid to remove the weather-related contingencies. (Compl. at ¶ 111.) According to the Complaint, Access's statements in this regard contained deliberate misrepresentations that Access was willing to cover these contingencies and approve STIOS's change orders when in fact it never intended to do so, and that, in reasonable reliance on these misrepresentations, STIOS entered into an agreement that it would not have otherwise made. (*See id.* at ¶¶ 112-16.)

In its Motion to Dismiss, however, the Access Defendants argue that the fraud claim is barred by the parol evidence rule. (*See* Defs.' Br. in Supp. of Mot. to Dismiss, Doc. 13, at 10.) The parol evidence rule provides that:

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement. All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)) (internal alterations omitted).

Defendants are also correct to note the rule that "[w]ith regard to the exception for

19

fraud, [the Pennsylvania Supreme Court] has restricted the exception to allegations of fraud

in the execution of a contract, and has refused to apply the exception to allegations of fraud

in the inducement of a contract." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 204-05 (Pa.

2007). In other words, parol evidence may be admitted based on a party's claim that "a

term was fraudulently omitted from the contract" but not on a claim that "an opposing party

made false representations that induced the complaining party to agree to the contract."

*Yocca*, 854 A.2d at 437 n.26. Because Plaintiff's claim explicitly relies on "fraud in the

inducement," it could be barred under Pennsylvania's parol evidence rule.

> Nonetheless, the Court finds dismissal on this ground would be premature.

> [F]or the parol evidence rule to apply, there must be a writing that represents
> the "entire contract between the parties." To determine whether or not a
> writing is the parties' entire contract, the writing must be looked at and "if it
> appears to be a contract complete within itself, couched in such terms as
> import a complete legal obligation without any uncertainty as to the object or
> extent of the parties' engagement, it is conclusively presumed that the writing
> represents the whole engagement of the parties."

*Id.* at 436 (quoting *Gianni*, 126 A. at 792) (internal alterations omitted). As discussed above,

the Court has been provided an express contract between STIOS and the Chesapeake

Defendants and, therefore, if Count XI were alleged against Chesapeake, the Court could

dismiss on the grounds that the agreement submitted is a full, integrated statement of the

parties' agreement. As to Access, however, the Court only has documents that show that

"some" contract governs the parties' relationship. This may be the same Master Service

Agreement entered into between STIOS and COI, but whether it is cannot be ascertained

20

on the face of the materials submitted to this Court on the Motion to Dismiss. It is at least possible, as discussed above, that a different agreement with different terms applies to the Access Defendants and that that agreement may not be fully integrated such as to "represent the whole engagement of the parties." Because this possibility remains, and because it cannot be answered at the Motion to Dismiss stage, the Court must deny Defendants' Motion as to the fraud claim.

### c. Punitive Damages

Finally, Defendants attack Plaintiff's claim for punitive damages, which is included as part of the fraud claim. (See Doc. 13 at 13.) "The standard governing the award of punitive damages in Pennsylvania is settled. 'Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others.'" *Hutchison ex rel. Hutchison v. Luddy*, 870 A.2d 766, 770 (Pa. 2005) (quoting *Feld v. Merriam*, 485 A.2d 742, 747 (Pa. 1984)). They "are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton, or reckless conduct." *Id.* (citing *SHV Coal, Inc. v. Cont'l Grain Co.*, 587 A.2d 702, 704 (Pa. 1991)). In determining whether punitive damages are appropriate, "one must look to 'the act itself together with all the circumstances including the motive of the wrongdoers and the relations between the parties.'" *Feld*, 485 A.2d at 748 (quoting *Chambers v. Montgomery*, 192 A.2d 355, 358 (Pa. 1963)). "The state of mind of the actor is vital. The act, or the failure to act, must be intentional, reckless or malicious." *Id.*

21

Here, Plaintiff alleges intentional misrepresentations made to induce it into entering into an agreement that it would not otherwise have entered. (*See* Compl. at ¶¶ 111-12.) Though Defendants argue that Plaintiff has not sufficiently pled "outrageous" conduct beyond these averments, fraudulent misrepresentations can be sufficient under Pennsylvania law to support a claim for punitive damages. *See, e.g., Delahanty v. First Pa. Bank, N.A.*, 464 A.2d 1243, 1263-65 (Pa. Super. Ct. 1983). And while the instant pleadings are admittedly lacking in some detail, they do state that the Access Defendants made fraudulent misrepresentations for the purpose of inducing STIOS to enter into a bad agreement, and that these misrepresentations caused STIOS at least forty-million dollars in damages that it would not otherwise have incurred. Given the severity of the alleged damage to STIOS and the allegations that such damage was incurred based on deliberate misrepresentations, the Court cannot find at this stage that Access's alleged actions were not outrageous as a matter of law. While further discovery may demonstrate that Access did not act outrageously—or even that the fraud claim is altogether barred by the parol evidence rule—such a determination cannot be made on the face of the pleadings alone.

Accordingly, the Court will deny Defendant's Motion on the punitive damages request.

## V.   Conclusion

For the foregoing reasons, Defendants' Motion to Dismiss (Doc. 12) is **GRANTED IN PART AND DENIED IN PART**. A separate Order follows.

Robert D. Mariani
United States District Judge