IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

STI OILFIELD SERVICES, INC., :
:
    **Plaintiff,** :
:
v. : 3:13-CV-02923
: (JUDGE MARIANI)
ACCESS MIDSTREAM :
PARTNERS, et al., :
:
    **Defendants.** :

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is a Motion for Summary Judgment, (Doc. 78), filed by two of the four Defendants in this case. As a result of this Court's ruling on Defendants' prior Joint Motion to Dismiss, (Docs. 49, 50), Plaintiff's Complaint, (Doc. 1), has five of the original eleven counts remaining, all concerning a series of contracts for natural gas pipeline construction. Count I, a breach of contract claim, and Count V, a claim pursuant to Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 *et seq.* ("CASPA"), are against Defendants Chesapeake Operating, Inc. and Chesapeake Energy Corporation (collectively "the Chesapeake Defendants"). Count VI, a breach of contract claim, Count X, a claim pursuant to CASPA, and Count XI, a fraud claim, are against Defendants Access Midstream Partners, L.P., and Appalachia Midstream Services, L.L.C., (collectively "the Access Defendants"). The Chesapeake Defendants have brought the

present Motion for Summary Judgment on the basis that (1) they are not parties to the Rome and Oilcan agreements on which Plaintiff seeks damages for breach, and (2) the claim for breach is itself deficient. For the reasons that follow, the Court will deny their Motion.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, the Chesapeake Defendants submitted a Statement of Material Facts in Support of its Motion for Summary Judgment, (Doc. 79), as to which it contends that there is no genuine dispute for trial, and Plaintiff submitted a response, (Doc. 100).[1] Unfortunately, both parties seem to have disregarded the purpose of Local Rule 56.1, with the Chesapeake Defendants making inferential leaps with their facts that would have been more appropriate in the argument section of their brief, and Plaintiff refusing to admit statements that are undeniable. Nevertheless, the Court has gleaned the following undisputed facts from the record:

### A. Corporate Relationships between Defendants

Chesapeake Midstream Partners filed paperwork with the U.S. Securities and Exchange Commission in early 2012 in which it stated that Chesapeake Energy Corporation

---

[1] The Chesapeake Defendants also submitted a reply to Plaintiff's response to the Chesapeake Defendants' Statement of Material Facts, (Doc. 113), in which they replied to Plaintiff's responses to the Chesapeake Defendants' original statements. Because Local Rules 56.1 does not provide for such a reply, the Court has disregarded it.

2

and Affiliates had a 45.2% limited partner interest in Chesapeake Midstream Partners.[2] (Doc. 79, Ex. 42 at 7). Chesapeake Energy Corporation's 2013 annual report to the U.S. Securities and Exchange Commission lists Chesapeake Operating, Inc. as a subsidiary of Chesapeake Energy Corporation. (Doc. 79, Ex. 39). Therefore, it appears from these two filings that, at least at some point, Chesapeake Energy Corporation owned some or part of both Chesapeake Operating and Chesapeake Midstream Partners. The record, however, is unclear about when either of these ownership interests were originally acquired.

Then, sometime in mid-2012, Chesapeake Energy Corporation sold all of its interest in Chesapeake Midstream Partners. (Doc. 79 at ¶ 19; Doc. 79, Ex. 39; Doc. 100 at ¶ 19). On July 24, 2012, Chesapeake Midstream Partners changed is corporate name to Access Midstream Partners, L.P. (Doc. 79 at ¶¶ 18, 20; Doc. 100 at ¶ 18, 20).

### B. Plaintiff's Contracts

Plaintiff, STI Oilfield Services, Inc., is a pipeline contractor. (Doc. 79 at ¶ 4; Doc. 100 at ¶ 4). In 2011, Plaintiff entered into a Master Service Agreement ("MSA") with Chesapeake Operating, Inc. (Doc. 79, Ex. 3). The front page of the MSA stated that it was between "CHEASPEAKE OPERATING, INC. and any present or future subsidiaries or affiliates named directly or indirectly by Chesapeake Operating, Inc. (herein collectively 'Company')" and "STI Group: Southeast Texas Industries Inc., STIS, Inc., STI-Oilfield

---

[2] The same filing showed that Global Infrastructure Partners and Affiliates had a 22.9% limited partner interest, Chesapeake Midstream GP, L.L.C., has a 2% general partner interest, and public unitholders had a 29.9% limited partner interest in Chesapeake Midstream Partners. (Doc. 79, Ex. 42 at 7).

3

Services Inc., and any present or future subsidiaries or affiliates named directly or indirectly by STI Group: Southeast Texas Industries Inc., STIS, Inc., STI-Oilfield Services Inc., (herein collectively 'Contractor')." (*Id.*).

By its terms, the MSA did several things. First, the "Company . . . maintain[ed] an approved list of Contractors and . . . offer[ed] work or contracts only to those Contractors" on the approved list. (*Id.* at 4). Executing the MSA added Plaintiff to this "approved list of Contractors." (*Id.*). Second, the terms of the MSA "control[ed] and govern[ed] any and all performance of services and/or supply of materials and equipment by Contractor for Company." (*Id.*).

Then, in February and April of 2012, before Chesapeake Energy Corporation sold all of its interest in Chesapeake Midstream Partners, Plaintiff entered into a series of Pricing and Scheduling Agreements to perform construction work on a series of natural gas pipelines projects. (Doc. 79 at ¶¶ 1, 14, 16, 18; Doc. 100 at ¶¶ 1, 14, 16, 18). Although there was a total of eighteen Pricing and Scheduling Agreements, they concerned two larger projects: the Rome project and the Oilcan project. (Doc. 79 at ¶¶ 14, 16, 43, 94; Doc. 100 at ¶¶ 14, 16, 43, 94). The seven Rome project Pricing and Scheduling Agreements were signed on February 17, 2012. (Doc. 79 at ¶ 14; Doc. 100 at ¶ 14). The eleven[3] Oilcan

---

[3] The Court notes that although the parties seem to agree that there are eleven Pricing and Scheduling Agreements for the Oilcan project, (Doc. 79 at ¶ 94; Doc. 100 at ¶ 94), there appears to be only ten agreements, with the Driscoll 6" and 8" well line projects combined on one Pricing and Scheduling Agreement and given the same identification number. (Doc. 79, Ex. 11). This inconsistency, however, seems to be immaterial to the current Motion. Therefore, the Court will proceed assuming there are eleven Pricing and Scheduling Agreements for the Oilcan project.

4

project Pricing and Scheduling Agreements were signed on April 19, 2012. (Doc. 79 at ¶ 16; Doc. 100 at ¶ 16).

All of the seven Rome project Pricing and Scheduling Agreements have the Chesapeake Energy logo on the front of the Agreement. (Doc. 79, Exs. 4-10). Opposite this logo, is several lines of information which identifies the company as "Chesapeake Midstream Energy" to the attention of Andrew Bischoff of 100 1st Center, Horseheads, NY 14845. (*Id.*). On the last page of the seven Rome project Agreements is a signature line where Jerrod Gill signed for "STI Group." (*Id.*). Below Mr. Gill's signature is the words "Chesapeake Approval" followed by signature lines for the following: CMD Construction Superintendent, Jimmy Rowell, CMD Project Manager, Andrew Bischoff, CMD Manager of Engineering & Construction, Joel Moore, and CMD Development & Operations Manager, Patrick Myers. (*Id.*). Six of the seven Agreements appear to be signed by Jimmy Rowell, Andrew Bischoff and Patrick Myers. (Doc. 79, Exs. 4-9). The final Agreement appears to be signed by Jimmy Rowell and Andrew Bischoff. (Doc. 79, Ex. 10).

There are also eleven similar Pricing and Scheduling Agreements for the Oilcan project. (Doc. 79, Ex. 11). Each has a similar page that has the Chesapeake Energy logo and lists the company as "Chesapeake Midstream Energy." (*Id.*). They differ from the Rome contracts, however, in two respects. First, they are to the attention of Fernando Rodriguez—not Andrew Bischoff—but lists the same address: 100 1st Center, Horseheads, NY 14845. (*Id.*). Second, they have a single signature page for all eleven Agreements.

(*Id.*). The signature page again contains the words "Chesapeake Approval" followed by signature lines for the following: CMD Construction Superintendent, Jimmy Rowell, CMD Project Manager, Fernando Rodriguez, CMD Manager of Engineering & Construction, Joel Moore, and CMD Development & Operations Manager, Patrick Myers. (*Id.*). Each signature line is signed. (*Id.*).

Between September and December of 2012, several of Plaintiff's employees sent several emails to Tim Peck—at an email address ending in "@chk.com"—regarding various aspects of the Rome and Oilcan projects. (Doc. 79, Exs. 31-35). Tim Pecks' email signature line listed him as "Project Manager, Access Midstream Partners, L.P." (*Id.*). Then, in May of 2013, one of Plaintiff's employees sent Tim Peck an email—this time at an email address ending in "@AccessMidstream.com"—inquiring about the status of "the move around change orders." (Doc. 79, Ex. 36). In addition, Plaintiff sent several invoices from the Rome and Oilcan projects to 100 1st Center, Horseheads, NY 14845. (Doc. 79, Exs. 14-28). These invoices were addressed to "Chesapeake Midstream Mgmt, LLC," "Chesapeake Midstream Energy,"[4] or "Access Midstream Partners." (*Id.*).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

---

[4] On several of the invoices the name "Chesapeake Midstream Energy" was crossed out and "AMS" was written in. Defendants note, however, that it is unclear when the documents were altered or who altered them. (Doc. 79 at ¶ 100, n.3).

. . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW*,

*Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

In their brief, the Chesapeake Defendants raise two main arguments. First, they argue that they are not a party to the Pricing and Scheduling Agreements for the Rome and Oilcan projects and therefore cannot be liable for the breach of contract claim or the CASPA claim. (Doc. 80 at 8-12). Second, they argue that Plaintiff's "move-around" claims are meritless because Plaintiff cannot identify the days the move-arounds occurred and other essential facts to their claim. (Doc. 80 at 12-14). The Court will address each argument in turn.

In their first argument, the Chesapeake Defendants contend that because they are not a party to the contracts for the Rome and Oilcan projects, they cannot be liable for breach of contract. In Pennsylvania, "[t]o successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005). "It is fundamental contract law that one cannot be liable for a breach of contract unless one is a party to that contract." *Electron Energy Corp. v. Short*, 597 A.2d 175, 177 (Pa. Super. Ct. 1991).

The Chesapeake Defendants contend that there is no evidence that they were party to the Rome and Oilcan Pricing and Scheduling Agreements, and therefore they cannot be liable under them. (Doc. 80 at 9). To support their argument, the Chesapeake Defendants point to (1) the invoices Plaintiff sent to "Chesapeake Midstream Mgmt, LLC," "Chesapeake Midstream Energy," and "Access Midstream Partners"; (2) the various emails Plaintiff's employees sent to employees of Chesapeake Midstream Partners and Access Midstream Partners; (3) the construction drawings from which Plaintiff worked had the Chesapeake Midstream name and logo on them; and (4) one of Plaintiff's employees was aware that Chesapeake Midstream had changed its name to Access. (Id. at 10-11). Plaintiff responds by arguing that there is an issue of material fact as to whether the Chesapeake Defendants were parties to the Pricing and Scheduling Agreements because (1) the name on the contracts, "Chesapeake Midstream Energy," is ambiguous; (2) the Chesapeake Energy

9

logo, not the Chesapeake Midstream Partners logo, was found on all the contracts, (3) the agreements stated "Chesapeake approval" above the signature lines; and (4) the CMD acronym on the signature lines is ambiguous. (Doc. 99 at 4-7). Upon review of the record and the parties' arguments, the Court finds that there is a genuine dispute as to a material fact that makes entry of summary judgment inappropriate in this case.

It is undisputed that a representative of Plaintiff, Jerrold Gill, signed all of the Rome and Oilcan contracts. Beyond that, it is undisputed that the Rome contracts had four other signature lines, and the signature lines for at least two of the following three individuals have signatures placed next to the following names: Jimmy Rowell, Andrew Bischoff, and Patrick Myers. Similarly, it is also undisputed that the Oilcan contracts, which had one signature page, have signatures placed next to the following names: Jimmy Rowell, Fernando Rodriguez, Joel Moore, and Patrick Myers. The contracts themselves, however, provide no clear indication of who these individuals represent.

First, the company name on the contracts—"Chesapeake Midstream Energy"—is not the name of any of the entities that are party to this lawsuit. The name appears to be a combination of Chesapeake Midstream Partners and Chesapeake Energy Corporation. Second, the CMD acronym associated with the signatures is nowhere defined in the contracts and is not an obvious acronym for Chesapeake Midstream Partners. Third, the statement above the signatures—"Chesapeake Approval"—provides no indication which Chesapeake entity/entities is approving the contracts. Finally, the presence of the

Chesapeake Energy logo on the front of the contracts would seem to indicate that the contracts were connected with Chesapeake Energy Corporation. The remainder of the record provides no clarity. It is devoid of any reference to who these individuals are, who they work for, and which Chesapeake entity/entities they were representing, if any, when they signed the contracts.[5] Thus, Plaintiff is correct that there is a genuine dispute as to exactly who is party to the Rome and Oilcan contracts.

The Chesapeake Defendants, in their reply brief, state that "the employees signing or identified on the Rome and Oilcan Contracts . . . were all employees or agents of Chesapeake Midstream." (Doc. 112 at 4). The Chesapeake Defendants' only support for this statement is a citation to the contracts themselves. (*Id.*). But as discussed above, those contracts give no definitive indication who the signatories work for. The Chesapeake Defendants further point out that two of signatories, Patrick Myers and Jimmy Rowell, are identified on the MSA as the "Chesapeake Field Personnel Requesting Services." (*Id.* at 4-5). But this ambiguous statement does not give any indication which Chesapeake entity/entities Myers and Rowell worked for. The other evidence the Chesapeake Defendants cite to does not shed any more light on who these individuals are. Conversely, the evidence Plaintiff cites to above, viewed in a light most favorable to Plaintiff, shows that the signatories to the contracts may have represented Chesapeake Operating, Inc. and/or Chesapeake Energy Corporation.

---

[5] There is one email in the record from Jimmy Rowell, but it provides no information about which Chesapeake entity/entities he works for. (Doc. 100, Ex. 12).

11

Finally, the Chesapeake Defendants argue that "the burden of proving these individuals were employed by or agents of the Chesapeake Defendants and not Chesapeake Midstream[ ] rests with Plaintiff." (*Id.* at 5). While it will be Plaintiff's burden at trial to show that these individuals are connected to the Chesapeake Defendants, the Court cannot grant summary judgment on a record where it is unclear which Chesapeake corporation the signatories represented, if any, when they signed the contracts. Had the Chesapeake Defendants pointed towards some evidence that the signatories were not employees of, nor did they ever represent, Chesapeake Operating, Inc. and Chesapeake Energy Corporation, Plaintiff's current showing may not have been sufficient. This is not to say, of course, that the Court is requiring the Chesapeake Defendants to disprove Plaintiff's case in order to prevail on their summary judgment motion. *See Celotex Corp.*, 477 U.S. at 323. The Court is simply observing that the contracts themselves are ambiguous and the Chesapeake Defendants' submissions with its Motion have not resolved this material ambiguity. Thus, the Chesapeake Defendants have not met their initial burden of showing the absence of a genuine issue as to any material fact.

Given that there has been no facts presented about who the individuals who signed the contracts are, Plaintiff's showing at this stage—that the contracts (1) did not clearly identify the contracting corporate entity/entities, (2) had the Chesapeake Energy logo on them, (3) had the ambiguous statement "Chesapeake Approval" above the signature lines, and (4) had an ambiguous acronym CMD before each signature—is sufficient to show that

there is an dispute of fact for trial, namely which Chesapeake entity/entities, if any, the signatories represented when they signed the contracts.

The Chesapeake Defendants next argue that Plaintiff's move-around claims should fail because (1) Plaintiff cannot prove damages with sufficient specificity; and (2) Plaintiff cannot show that the Chesapeake Defendants had any contractual obligation that would result in liability under the alleged facts. (Doc. 80 at 13-14).

A "move-around" occurs when a construction crew encounters an obstruction on the pipeline so that they have to move their crews and equipment to the other side of the obstruction. (Doc. 79 at ¶ 126; Doc. 100, Ex. 9 at 270-71; Doc. 100, Ex. 5 at 139-40). Plaintiff claims that two of Defendants' boring contractors failed to complete horizontal drilling on time, which meant that Plaintiff could not continue laying pipe. (Doc. 79 at ¶ 128; Doc. 100 at ¶ 128). Plaintiff further claims that when this occurred, it required three "move-arounds": the initial move past the area in which it could not work, the move back when the horizontal drilling was complete so it could finish laying pipe where it left off, and then, after the uncompleted section was complete, a move to a new section of the project. (Doc. 79 at ¶ 130; Doc. 100 at ¶ 130). Plaintiff claims that on six occasions it reached an area in the project where the horizontal drilling was not completed and that it was directed by "Chesapeake" to move-around the uncompleted drilling. (Doc. 79 at ¶ 128; Doc. 100 at ¶¶ 128, 129; Doc. 100, Ex. 17 at 182). Plaintiff has identified the dates of the move-arounds as occurring between May of 2012 through August of 2012. (Doc. 79 at ¶ 132; Doc. 100 at ¶

132). The Oilcan contracts state a unit price of $6,565.00 for the line item: "Company requested Move-Around (per crew) requires loading and hauling equipment on state or township rd (per loaded low-boy)." (Doc. 79, Ex. 11).

To prove damages in a breach of contract claim "a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (quoting *ATACS Corp. v. Trans World Commc'n, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *ATACS Corp.*, 155 F.3d at 669-70 (quoting *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)). "If a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages." *Thorsen v. Iron & Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984); *see also Scobell Inc. v. Schade*, 688 A.2d 715, 719 (Pa. Super. Ct. 1997). "A grant of summary judgment on the sole basis of absence of provable damages, therefore, is generally improper." *Thorsen*, 478 A.2d at 931.

The Chesapeake Defendants argue that because Plaintiff cannot identify the specific dates that the move-arounds occurred, Plaintiff will be unable to prove that they actually occurred, and thus Plaintiff cannot prove damages beyond mere speculation. (Doc. 80 at 13).[6] Even assuming the truth of the Chesapeake Defendants' argument, summary

---

[6] The Chesapeake Defendants also puts forth the following argument:

14

judgment would be inappropriate because of the availability of nominal damages. *See Zeno v. Ford Motor Co., Inc.*, 480 F. Supp. 2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages for a breach of contract, summary judgment cannot be granted for failure to show damages."). Nevertheless, the Chesapeake Defendants' argument fails for other reasons. Plaintiff claims the move-around occurred sometime between May of 2012 and August of 2012. (Doc. 79 at ¶ 132; Doc. 100 at ¶ 132). There is evidence in the record that Plaintiff's employees calculated that they performed 309 move-arounds. (Doc. 79, Ex. 46 at 270-71). Thus, a factfinder could calculate damages to a reasonable certainty by multiplying the contract unit price—$6,565.00—by the number of company requested move-arounds. Further, a factfinder could reasonably believe a witness who testifies that the move-arounds occurred, even if they cannot remember the specific dates in which they occurred, but only a four month date range.

---

> Plaintiff further cannot prove the number of crews on-site involved in each alleged move, or the number of lowboys involved with each move, both factors to be considered when calculating damages related to the moves. (SOF ¶¶ 137-38.) Instead, Plaintiff estimates the number of lowboys involved in each move, using a calculation based on averages which cannot be tested. Because Plaintiff claims a certain average number of lowboys and crews for each move, the claim is speculative and not based on evidence.

(Doc. 80 at 13-14). The only support the Chesapeake Defendants provide for this argument is the citation to two paragraphs in their Statement of Facts, (Doc. 79 at ¶¶ 137, 138). Those two paragraphs in the Chesapeake Defendants' Statement of Facts, however, contain no citation to the record as required by Local Rule 56.1. This Court will not scour the record to search for the support the Chesapeake Defendants failed to cite. *See Doeblers' Pa. Hybrids, Inc. v. Doebler*, 442 F.3d 812, 821 n.8 (3d Cir. 2012) ("Judges are not like pigs, hunting for truffles buried in the record.") (internal quotation marks omitted). Thus, the Court rejects these arguments. (Doc. 77).

15

In this way, the Chesapeake Defendants' argument boils down to credibility. They are arguing that a factfinder should not believe that the move-arounds occurred because, without the exact dates, the claim cannot be credible. On summary judgment however, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)); *see also Anderson*, 477 U.S. at 255. Viewing the evidence in a light most favorable to Plaintiff, Plaintiff can establish damages with a reasonable certainty without identifying the exact dates within the four month time frame in which the move-arounds occurred.

The Chesapeake Defendants' second argument is that Plaintiff cannot show that it ever informed Defendants when Plaintiff expected to arrive on the sites where drilling was being conducted, and it is also unable to show that the Chesapeake Defendants were under any contractual obligation to ensure the drilling was complete by the time Plaintiff arrived on site. (Doc. 80 at 14). There are two deficiencies with this argument. First, the Chesapeake Defendants fail to provide any citation to the record to support their assertions. *See supra* n.7. Thus, the Court is unable to properly evaluate the factual portion of the Chesapeake Defendants' argument.

Second, even if the argument was supported by the record, there is also testimony in the record by Jerrold Gill that Chesapeake directly requested at least some of the move-

arounds. (Doc. 100, Ex. 17 at 182). If true, this would seem to qualify as a "company requested" move-around regardless of whether the Chesapeake Defendants had a contractual obligation to ensure the drilling was complete by the time Plaintiff arrived on site. In their reply brief, the Chesapeake Defendants argue that this Court should disregard this testimony by Mr. Gill as hearsay because Mr. Gill was not on the project sites and therefore did not have first-hand knowledge of the facts regarding the move-arounds. (Doc. 112 at 17). But it is not clear on the face of the transcript whether Mr. Gill's testimony is hearsay,[7] whether he was ever on the project sites, or whether his statements were based on personal knowledge or not. The Chesapeake Defendants have not pointed to the portions of the record which show that Mr. Gill does not have firsthand knowledge of the move-arounds.

In sum, the Chesapeake Defendants have failed to meet their burden of showing the absence of a genuine dispute as to any material fact.

---

[7] Mr. Gill's relevant testimony is as follows:

Q. So, on this one, the bores were not completed by -- so if I understand it correctly, STI is laying the pipe, they are doing everything they are supposed to do, and then you get to an area where you can no longer continue on because a bore is not completed, is that accurate?
A. That's accurate.
Q. So when that occurred -- so you get to the site, and what happened then when you can no longer -- were you directed to do work somewhere else by Chesapeake?
A. Yes.
Q. And so that is what you would consider to be a company-requested move-around?
A. Yes.
Q. And this request, was that something they put in writing?
A. Not that I recall.

(Doc. 100, Ex. 17 at 182).

17

## V. CONCLUSION

For the reasons outlined above, this Court will deny the Chesapeake Defendants' Motion for Summary Judgment, (Doc. 78). A separate Order follows.

Robert D. Mariani
United States District Judge