# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **STI OILFIELD SERVICES, INC.,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **3:13-CV-02923** |
| | : | **(JUDGE MARIANI)** |
| **ACCESS MIDSTREAM** | : | |
| **PARTNERS, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OPINION

### I. INTRODUCTION AND PROCEDURAL HISTORY

Presently before the Court is a Motion for Summary Judgment, (Doc. 81), filed by

two of the four Defendants in this case. As a result of this Court's ruling on Defendants'

prior Joint Motion to Dismiss, (Docs. 49, 50), Plaintiff's Complaint, (Doc. 1), has five of the

original eleven counts remaining, all concerning a series of contracts for natural gas pipeline

construction. Count I, a breach of contract claim, and Count V, a claim pursuant to

Pennsylvania's Contractor and Subcontractor Payment Act, 73 P.S. § 501 *et seq.*

("CASPA"), are against Defendants Chesapeake Operating, Inc. and Chesapeake Energy

Corporation (collectively "the Chesapeake Defendants"). Count VI, a breach of contract

claim, Count X, a claim pursuant to CASPA, and Count XI, a fraud claim, are against

Defendants Access Midstream Partners, L.P., and Appalachia Midstream Services, L.L.C.,

(collectively "the Access Defendants"). The Access Defendants have brought the present

Motion for Summary Judgment.  For the reasons that follow, the Court will grant in part and deny in part the Access Defendants' Motion.

## II. STATEMENT OF UNDISPUTED FACTS

In accordance with Local Rule 56.1, the Access Defendants submitted a Statement of Material Facts in Support of its Motion for Summary Judgment, (Doc. 83), as to which it contends that there is no genuine dispute for trial, and Plaintiff submitted a response, (Doc. 96).[1]  Both parties seem to have disregarded the purpose of Local Rule 56.1, however, with the Access Defendants making inferential leaps from their factual assertions that would have been more appropriate in the argument section of their brief, and Plaintiff refusing to admit statements that are seemingly undeniable, issuing denials based on pedantic distinctions, or denying an assertion while embedding an admission within the "denial." Nevertheless, the Court has gleaned the following undisputed facts from the record:

Plaintiff, STI Oilfield Services, Inc., is a pipeline contractor.  (Doc. 83 at ¶ 4; Doc. 96 at ¶ 4).  In 2011, Plaintiff entered into a Master Service Agreement ("MSA").  (Doc. 83 at ¶ 44; Doc. 96 at ¶ 44).  The front page of the MSA stated that it was between "CHEASPEAKE OPERATING, INC. and any present or future subsidiaries or affiliates named directly or indirectly by Chesapeake Operating, Inc. (herein collectively 'Company')" and "STI Group: Southeast Texas Industries Inc., STIS, Inc., STI-Oilfield Services Inc., and any present or

---

[1] The Access Defendants also submitted a reply to Plaintiff's response to the Access Defendants' Statement of Material Facts, (Doc. 116), in which they replied to Plaintiff's responses to the Access Defendants' original statements.  Because Local Rules 56.1 does not provide for such a reply, the Court has disregarded it.

future subsidiaries or affiliates named directly or indirectly by STI Group: Southeast Texas Industries Inc., STIS, Inc., STI-Oilfield Services Inc., (herein collectively 'Contractor')." (MSA, Doc. 83, Ex. 26). At the time the MSA was executed, paperwork filed with the U.S. Securities and Exchange Commission listed Chesapeake Energy Corporation as owning part of both Chesapeake Operating and Chesapeake Midstream Partners. (Chesapeake Energy Corporation, Annual Report, Doc. 83, Ex. 21; Chesapeake Midstream Partners, L.P., Prospectus, Doc. 83, Ex. 22). Then, sometime in mid-2012, Chesapeake Energy Corporation sold all of its interest in Chesapeake Midstream Partners. (Doc. 83 at ¶ 33; Doc. 96 at ¶ 33). On July 24, 2012, Chesapeake Midstream Partners changed its corporate name to Access Midstream Partners, L.P. (Doc. 83 at ¶ 30-31; Doc. 96 at ¶ 30-31). No other MSA exists between the Access Defendants and Plaintiff. (Doc. 83 at ¶ 54; Doc. 96 at ¶ 54).

Beginning in August of 2012, Plaintiff bid on and was awarded a series of four contracts with the Access Defendants. (Doc. 83 at ¶¶ 71, 76, 84, 86, 96, 98, 108, 110; Doc. 96 at ¶¶ 71, 76, 84, 86, 96, 98, 108, 110). The four contracts concerned four natural gas pipeline construction projects. (Doc. 83 at ¶¶ 38, 69, 82, 94, 106; Doc. 96 at ¶¶ 38, 69, 82, 94, 106). The four main projects, each of which were composed of a series of smaller projects, were colloquially known as Black West, Zaplok East, Welded West, and Zaplok West. (Doc. 83 at ¶¶ 38, 69, 70, 82, 83, 94, 95,106, 107; Doc. 96 at ¶¶ 38, 69, 70, 82, 83, 94, 95,106, 107).

3

The four contracts arose in the following fashion. Prior to bidding, Plaintiff was given several documents, including the "Instruction to Bidders" ("ITB"), and the "Scope of Work" ("SOW"). (Doc. 83 at ¶ 56; Doc. 96 at ¶¶ 56, 61). These documents described what work Plaintiff was bidding on. The ITB, among other things, defined the scope of work for the contracts to include "the following documents: 1) Scope of Work 2) Contracts Documents 3) Erosion, Sedimentation, Pollution Control (ESPC) Plans including Restoration Plans 4) Construction Alignment Sheets 5) Right-of-Way LOWs 6) COMPANY Standards 7) COMPANY Specifications 8) Project Schedule 9) CONTRACTOR Safety Manual 10) COMPANY/CONTRACTOR Master Services Agreement." (ITB, Doc. 83, Ex. 32 at § 2.08).

Plaintiff then submitted bids on each of the four projects. (Doc. 83 at ¶¶ 69, 82, 94, 106; Doc. 96 at ¶¶ 69, 82, 94, 106). The Access Defendants then issued a Notice of Award if they accepted the bid. (Doc. 83 at ¶¶ 76, 85, 98, 110; Doc. 96 at ¶¶ 76, 85, 98, 110). Plaintiff received a Notice of Award for the Black West Project on September 18, 2012, (Doc. 83 at ¶ 76; Doc. 96 at ¶ 76), for the Zaplok East Project and the Welded West Project on October 5, 2012, (Doc. 83 at ¶¶ 85, 98; Doc. 96 at ¶¶ 85, 98), and for the Zaplok West Project on November 21, 2012. (Doc. 83 at ¶ 110; Doc. 96 at ¶ 110). Upon acceptance of the bid, several documents, including the ITB, became part of the agreements. (Doc. 83 at ¶ 66; Doc. 96 at ¶ 66). The result being that each "contract" is not a single self-contained document, but a compilation of several documents which became a contract when the Access Defendants accepted each of Plaintiff's bids.

4

During the end of 2012 until mid-2013 Plaintiff performed the pipeline construction

work. (Doc. 83 at ¶ 1; Doc. 96 at ¶ 1). After work was complete, Plaintiff filed the present

lawsuit, alleging: (1) the Access Defendants fraudulently induced Plaintiff into the four

contracts by falsely promising to pay certain contingencies if Plaintiff took them out of its bid;

(2) the Access Defendants breached the contracts by failing to pay Plaintiff for a variety of

work Plaintiff performed; and (3) the Access Defendants violated CASPA by failing to pay

Plaintiff for work performed. (Doc. 1).

### III. STANDARD OF REVIEW

Through summary adjudication, the court may dispose of those claims that do not

present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality,

. . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence

of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106

S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-

moving party must offer specific facts contradicting those averred by the movant to establish

a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct.

3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual

issue exists. *Anderson*, 477 U.S. at 248. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed. 2d 659 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

6

*Id.* (internal quotations, citations, and alterations omitted).

## IV. ANALYSIS

The Access Defendants have put forth several arguments for why they believe they are entitled to summary judgment. While some of their arguments focus on why judgment should be entered in their favor on certain counts, most of the arguments attack Plaintiff's specific theories of liability under its breach of contract claim. In Pennsylvania, "[t]o successfully maintain a cause of action for breach of contract the plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Hart v. Arnold*, 884 A.2d 316, 332 (Pa. Super. Ct. 2005).

"It is well established that the intent of the parties to a written contract is to be regarded as being embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Steuart v. McChesney*, 444 A.2d 659, 661 (Pa. 1982). "[W]here language is clear and unambiguous, the focus of interpretation is upon the terms of the agreement as manifestly expressed, rather than as, perhaps, silently intended." *Id.* "Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract." *Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. Ct. 1993). Further, "[w]here several instruments are made as part of one transaction they will be read together, and each will be construed with reference to the

7

other; and this is so although the instruments may have been executed at different times

and do not in terms refer to each other." *Huegel v. Mifflin Const. Co., Inc.*, 796 A.2d 350,

354-55 (Pa. Super. Ct. 2002) (quoting *Neville v. Scott*, 127 A.2d 755, 757 (Pa. Super. Ct.

1957)).

> The Pennsylvania Supreme Court has noted that
>
> [t]here is nothing sacrosanct about a written agreement. Granted that writing makes for specificity and clarity, reduces the chances for errors, and allows for constant reference as to what was agreed upon, it nevertheless holds no superior position over an oral compact in the realm of authoritative utterances, except where the Statute of Frauds intervenes or is invoked. The most ironclad written contract can always be cut into by the acetylene torch of parol modification supported by adequate proof. In *Achenbach v. Stoddard*, 253 Pa. 338, 98 A. 604, 605, this Court held:
>
>> "It is always competent for the parties to a written contract to show that it was subsequently abandoned in whole or in part, modified, changed, or a new one substituted. And this may be shown by parol, by showing either an express agreement or actions necessarily involving the alterations."
>
> Even where the contract specifically states that no non-written modification will be recognized, the parties may yet alter their agreement by parol negotiation. The hand that pens a writing may not gag the mouths of the assenting parties. The pen may be more precise in permanently recording what is to be done, but it may not still the tongues which bespeak an improvement in or modification of what has been written.

*Wagner v. Graziano Constr. Co.*, 136 A.2d 82, 83-84 (Pa. 1957).

"A written contract which is not for the sale of goods may be modified orally, even

when the written contract provides that modifications may only be made in writing."

*Somerset Cmty. Hosp. v. Allan B. Mitchell & Assocs., Inc.*, 685 A.2d 141, 146 (Pa. Super.

Ct. 1996). "An agreement that prohibits non-written modification may be modified by subsequent oral agreement if the parties' conduct clearly shows the intent to waive the requirement that the amendments be made in writing." *Id*. "A written agreement can be modified by a subsequent oral agreement provided the latter is based upon a valid consideration and is proved by evidence which is clear, precise and convincing." *Crown v. Cole*, 236 A.2d 532, 534 (Pa. Super. Ct. 1967). "[T]he mere suggestion or possibility of a contract arising from transactions between the parties is not enough; there must be evidence authorizing more than a conjecture or surmise." *Gloeckner v. Sch. Dist. of Baldwin Twp.*, 175 A.2d 73, 75 (Pa. 1961) (quoting *Knight v. Gulf Refining Co.*, 166 A. 880, 882 (Pa. 1933)). "This heightened burden of proof should be taken into account in ruling on summary judgment." *Justofin v. Metro. Life Ins. Co.*, 372 F.3d 517, 521 (3d Cir. 2004).

## A. Fraud Count

In Count XI of the Complaint, Plaintiff claims that the Access Defendants fraudulently induced Plaintiff to enter into the contracts by promising that the Access Defendants would pay for all Plaintiff's weather related contingencies if Plaintiff removed its weather related contingencies from its final bids. (Doc. 1 at ¶¶ 111-118). The Access Defendants argue that they are entitled to summary judgment on this count because the parol evidence rule bars Plaintiff from introducing any evidence of oral promises concerning subjects addressed in the contract. (Doc. 82 at 5-6).

The parol evidence rule provides that:

9

> Where the parties, without any fraud or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only, evidence of their agreement.   All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract and unless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms and agreements cannot be added to nor subtracted from by parol evidence.

*Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (quoting *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)) (internal alterations omitted).  "With regard to the [rule's] exception for fraud, [the Pennsylvania Supreme Court] has restricted the exception to allegations of fraud in the execution of a contract, and has refused to apply the exception to allegations of fraud in the inducement of a contract." *Toy v. Metro. Life Ins. Co.*, 928 A.2d 186, 204-05 (Pa. 2007).  In other words, parol evidence may be admitted based on a party's claim that "a term was fraudulently omitted from the contract" but not on a claim that "an opposing party made false representations that induced the complaining party to agree to the contract." *Yocca*, 854 A.2d at 437 n.26.  "[I]f it were otherwise the parol evidence rule would become a mockery, because all a party to the written contract would have to do to avoid, modify or nullify it would be to aver (and prove) that the false representations were *fraudulently* made." *Bardwell v. Willis Co.*, 100 A.2d 102, 104 (Pa. 1953) (emphasis original).  Thus, when the parol evidence rule applies to a particular contract, it bars any fraud in the inducement claims pertaining to that contract. *Hart*, 884 A.2d at 340-41; *Rahemtulla v. Hassam*, 539 F. Supp. 2d 755, 773-74 (M.D. Pa. 2008).

With the above in mind, the Court must first determine if the parol evidence rule

applies to these contracts.

> [F]or the parol evidence rule to apply, there must be a writing that represents
> the "entire contract between the parties." To determine whether or not a
> writing is the parties' entire contract, the writing must be looked at and "if it
> appears to be a contract complete within itself, couched in such terms as
> import a complete legal obligation without any uncertainty as to the object or
> extent of the parties' engagement, it is conclusively presumed that the writing
> represents the whole engagement of the parties."

*Yocca*, 854 A.2d at 436 (quoting *Gianni*, 126 A. at 792) (internal alterations and citations

omitted). When a contract "represents a final and complete expression of the parties'

agreement," it is considered integrated. *Lenzi v. Hahnemann Univ.*, 664 A.2d 1375, 1379

(Pa. Super. Ct. 1995). "The issue of whether a writing constitutes an integrated contract is a

question of law." *Id.* "An integration clause which states that a writing is meant to represent

the parties' entire agreement is . . . a clear sign that the writing is meant to be just that and

thereby expresses all of the parties' negotiations, conversations, and agreements made

prior to its execution." *Yocca*, 854 A.2d at 436.

Here, there is an integration clause in the MSA signed by Plaintiff which reads "[t]his

Agreement contains the entire agreement of the parties and supersedes any and all prior

negotiations or understandings, whether written or oral." (MSA, Doc. 83, Ex. 26 at § 17).

Further, the IBT provides that the scope of work to include "COMPANY/CONTRACTOR

Master Service Agreement (CONTRACTOR must have one in place)." (ITB, Doc. 83, Ex.

32 at 2.08). Thus, it appears that the IBT incorporates the MSA into it by reference and the

MSA's integration clause is "a clear sign that the writing . . . expresses all of the parties'

negotiations, conversations, and agreements made prior to its execution." *Yocca*, 854 A.2d

at 436. Plaintiff, however, argues that no MSA was in place between it and the Access

Defendants. (Doc. 95 at 8-10). Plaintiff puts forth six arguments for why the Access

Defendants are not party to the MSA.

First, Plaintiff argues that the MSA was between Plaintiff and Chesapeake

Operating, Inc., not either of the Access Defendants. (*Id.* at 8). The MSA, however, states

that it is between "CHEASPEAKE OPERATING, INC. and any present or future subsidiaries

or affiliates named directly or indirectly by Chesapeake Operating, Inc. (herein collectively

'Company')" and Plaintiff. (MSA, Doc. 83, Ex. 26). At the time it was signed, Chesapeake

Midstream Partners and Appalachia Midstream Services, L.L.C., were either subsidiaries or

affiliates of Chesapeake Operating. (Chesapeake Energy Corporation, Annual Report, Doc.

83, Ex. 21; Chesapeake Midstream Partners, L.P., Prospectus, Doc. 83, Ex. 22;

Chesapeake Midstream Partners, L.P., Annual Report, Doc. 83, Ex. 53). Thus, when

Plaintiff's bids were accepted, the MSA was between Plaintiff and, among others,

Chesapeake Midstream Partners and Appalachia Midstream Services.[2]

---

[2] In its Response to the Access Defendants' Statement of Material Facts, Plaintiff denies that
Appalachia Midstream Services is a party to the MSA. (Doc. 96 at ¶¶ 46, 48). Plaintiff's denial is based on
the fact that, in an unrelated lawsuit, Chesapeake Operating, Inc., Chesapeake Midstream Development,
and Appalachia Midstream Services denied that Appalachia Midstream Services was an affiliate of
Chesapeake Energy Corporation. (*Otis Eastern Services, Inc. v. Chesapeake Operating, Inc.*, No. 12-CV-
959, Answer to Complaint with Counterclaims, Doc. 96, Ex. 15 at ¶ 5). This denial, however, is not
inconsistent with the Access Defendants' Statement of Material Facts. The Access Defendants claim that
Chesapeake Midstream Partners is a subsidiary, not an affiliate, of Chesapeake Energy Corporation and

Then, sometime in mid-2012, Chesapeake Energy Corporation sold all of its interest

in Chesapeake Midstream Partners, and Chesapeake Midstream Partners changed its

corporate name to Access Midstream Partners, L.P. (Doc. 83 at ¶¶ 30, 31, 33; Doc. 96 at

¶¶ 30, 31, 33). This transaction and accompanying name change, however, did not revoke

the MSA between the parties. *See Bruno v. Bozzuto's, Inc.*, 850 F. Supp. 2d 462, 466

(M.D. Pa. 2012) ("Though a corporation changes its name, its identity does not change.");

*see also* 18A AM. JUR. 2D *Corporations* § 234; 18 C.J.S. *Corporations* § 140. Thus, the

Court rejects Plaintiff's argument that there was never an MSA between Plaintiff and the

Access Defendants.[3]

Plaintiff next argues that the MSA was not incorporated into the contracts with

Access because the ITB does not identify the MSA with sufficient specificity. (Doc. 95 at 9).

"[U]nder Pennsylvania law, '[i]ncorporation by reference is proper where the underlying

contract makes clear reference to a separate document, the identity of the separate

document may be ascertained, and incorporation of the document will not result in surprise

or hardship.'" *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 761

that Appalachia Midstream Services is a subsidiary of Chesapeake Midstream Partners—and thus would also be a subsidiary, not an affiliate, of Chesapeake Energy Corporations. Thus, because Plaintiff has not controverted the Access Defendants' statement, the Court deems this fact admitted. *See* Local Rule 56.1.

Further, Plaintiff also denies that Chesapeake Midstream Partners was a party to the MSA. (Doc. 96 at ¶¶ 46-47). Plaintiff, however, offers no citation to the record to support the specific contention that Chesapeake Midstream Partners was not a party to the MSA. Thus, the Court deems that fact admitted.

[3] Based on the above, the Court also rejects the following arguments Plaintiff's puts forth for why the MSA is not incorporated into its contracts with the Access Defendants: (1) Access did not come into existence until after the MSA was created and therefore could not be a party to it; (2) in an unrelated lawsuit Chesapeake Operating, Inc., denied that Appalachia was an affiliate of Chesapeake Energy Corporation; and (3) the MSA has an assignability clause and Plaintiff never gave its approval for Chesapeake Operating, Inc., to assign the MSA to Access. (Doc. 95 at 9-10).

(3d Cir. 2016) (second alteration original) (quoting *Std. Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 447 (3d Cir. 2003)).

Here, the ITB makes clear that the "COMPANY/ CONTRACTOR Master Service Agreement" is part of the contracts. (ITB, Doc. 83, Ex. 32 at 2.08). The identity of the MSA can be ascertained as it is the only MSA ever executed between Plaintiff and the Access Defendants. (Doc. 83 at ¶ 54, Doc. 96 at ¶ 54). Further, it appears that Plaintiff's employees referred to the MSA in several emails during and after the time Plaintiff was bidding on the four projects. (Sept. 10, 2012, email from Clark McLane to Jim Gipson, Doc. 83, Ex. 30; July 10, 2013, email from Hershel Rhodes to Dan Montgomery and Andrew Bonno, Doc. 83, Ex. 29; July 10, 2013, email from Hershel Rhodes to Jerrold Gill and others, Doc. 83, Ex. 31). Although Plaintiff argues that these emails do not specify which MSA the employees are referring to, (Doc. 96 at ¶ 55), Plaintiff admits there was only one MSA ever executed by it. (*Id.* at ¶ 54). Plaintiff offers no citation to the record to show that its employees could be referring to any other MSA. *See Scott*, 550 U.S. at 380 ("[W]here the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Finally, incorporating the MSA by reference will not result in surprise or hardship as Plaintiff independently agreed to the terms of the MSA months before bidding on the pipeline contracts with the Access Defendants, and was aware of the MSA during and after the bidding process. (MSA, Doc. 83, Ex. 26; Sept. 10, 2012, email from Clark McLane to Jim

Gipson, Doc. 83, Ex. 30; July 10, 2013, email from Hershel Rhodes to Dan Montgomery and Andrew Bonno, Doc. 83, Ex. 29; July 10, 2013, email from Hershel Rhodes to Jerrold Gill and others, Doc. 83, Ex. 31).

Plaintiff's final argument for why the MSA was not incorporated into its contracts with Access is that "Hershel Rhodes . . . [Plaintiff's] Contracts Manager, testified that Andrew Bonno . . . from Access told him that [Plaintiff] would be receiving a separate MSA with Access when the [name] change was complete." (Doc. 95 at 9). Plaintiff goes on to explain that Access never provided Plaintiff with a new MSA. This does not, however, change the fact that Plaintiff was a signatory to the 2011 MSA with Access at the time it submitted its bids to Access.

In light of the above, the Court finds that the MSA was incorporated into the four contracts. The Court further finds that because the contracts contain integration clauses, and are otherwise of a complete nature,[4] the contracts are fully integrated. The Court therefore turns to the question of how this affects Plaintiff's fraud count.

---

[4] Except for arguing that the MSA and its integration clause are not part of the four contracts, Plaintiff only proffers a single argument, in a footnote, for why the contracts are not fully integrated. Plaintiff cites to testimony of one of the Access Defendants' former employees, Keith Edmonds, who stated "I would consult our construction managers for their interpretation of standards and I would also sometimes consult with Randy and/or Greg as to the gray areas and from time to time would consult with Hilary on what contract language actually said verses meant." (Doc. 95-1 at 3). Plaintiff argues that this is evidence that the contracts had built-in ambiguity and were thus not fully integrated. Plaintiff, however, only supplied one page of the transcript where the quoted language is found. The lack of the surrounding pages leaves the Court unable to determine in what context Mr. Edmonds gave this answer, who the individuals are to whom Mr. Edmonds refers, and the meaning of the question to which Mr. Edmonds was responding. Thus, the Court is unable to evaluate the merit, if any, of Plaintiff's argument. Because Plaintiff did not provide sufficient record support for its argument, the Court rejects it. (Doc. 77).

Plaintiff claims that Mr. Edmonds, an employee of Access Midstream, requested that Plaintiff "remove its winter contingencies from its bids in exchange for the Access Defendants agreeing to compensate [Plaintiff] for any delays or losses because of weather conditions and stand downs." (Doc. 95 at 11). Plaintiff subsequently submitted bids to the Access Defendants that did not reference these oral agreements. The ITB, which Plaintiff had at the time of bidding and which became part of each contract when Plaintiff's bids were accepted, stated that the Access Defendants "will not be held monetarily responsible for weather delays or weather shutdowns. Crew shut down due to weather delays [are] at [Plaintiff's] expense." (ITB, Doc. 83, Ex. 32 at 2.08(8)(a)). Pennsylvania law is clear that Plaintiff cannot maintain a fraud in the inducement claim under these circumstances. *See, e.g., Hart*, 884 A.2d at 341 (holding that the parol evidence rule barred Plaintiff's fraud in the inducement claim when the written contract contained an integration clause). Simply put, Plaintiff "cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations." *Blumenstock v. Gibson*, 811 A.2d 1029, 1036 (Pa. Super. Ct. 2002).

Plaintiff puts forth two arguments for why its fraud claim should survive even if the four contracts are fully integrated: (1) the contracts were subsequently modified; and (2) the "admission exception" to the parol evidence rule applies. (Doc. 95 at 11). As to Plaintiff's first argument, Plaintiff argues that, after the contracts were awarded, Mr. Edmonds made promises that the Access Defendants would pay for losses due to weather conditions and

stand downs. (Doc. 95 at 11-12). While such evidence of a subsequent modification of the four contracts presents a basis for a claim of post-contract modification, *see* Section III.B, *infra*, this fact would not support a claim of fraud in the inducement. With respect to the timeline of events, Mr. Edmonds's actions that Plaintiff asserts subsequently modified the contract, by their very timing, occurred after the bids were accepted by the Access Defendants and after the four contracts were in place. Consequently, these subsequent modifications could not have induced Plaintiff to enter into the contracts because Mr. Edmonds subsequent modifications occurred later in time then Plaintiff's submission of the bids.

Further, these promises could not constitute any other fraud because "the breach of a promise to do something in the future is not actionable in fraud." *Shoemaker v. Commonwealth Bank*, 700 A.2d 1003, 1006 (Pa. Super. Ct. 1997); *see also Krause v. Great Lakes Holdings, Inc.*, 563 A.2d 1182, 1187-88 (Pa. Super. Ct. 1989) (holding that Defendant's "oral representation . . . that [it] would assume the obligation for [a] debt to [Plaintiffs] in return for a three year moratorium on payments and [Plaintiffs'] forbearance from immediate legal action" is not actionable fraud).

Plaintiff's second argument relies on the "admissions exception" to the parol evidence rule. In Pennsylvania, "there is an exception to the parol evidence rule when the party seeking to enforce the agreement as written has made admissions that the agreement does not, in fact, constitute the entire agreement between the parties even when it contains

17

an integration clause." *Giant Food Stores, Inc. v. Marketplace Commc'n Corp.*, 717 F. Supp. 1071, 1074 (M.D. Pa. 1989) (citing *Coal Operators Cas. Co. v. Charles T. Easterby & Co.*, 269 A.2d 671 (1970)). Thus, the parol evidence rule does not bar "the introduction of clear, precise and convincing evidence to show that the party who seeks to enforce the written agreement according to its tenor has admitted and acknowledged that the agreement as written did not express what the parties intended and that what the parties intended was omitted from the written agreement by mistake or accident." *In re Boyd's Estate*, 146 A.2d 816, 820 (Pa. 1958). "[T]he burden is on the proponent of the parol evidence to establish such an Admission of incompleteness in the writing by evidence which is 'clear, precise, and convincing'". *Scott v. Byrn Mawr Arms, Inc.*, 312 A.2d 592, 595 (Pa. 1973) (quoting *Dunn v. Orloff*, 218 A.2d 314 (1966)).

Plaintiff argues that Mr. Edmonds's deposition testimony constitutes an admission that renders parol evidence of a pre-contract oral agreement admissible. Plaintiff points to the fact that Mr. Edmonds testified that he negotiated with Plaintiff to remove its weather related contingencies in exchange for Mr. Edmonds's promise that the Access Defendants would share the risks of the weather. (Deposition of Keith Edmonds, Doc. 96, Ex. 9 at 66). Plaintiff argues that this is an admission that the four contracts did not contain the entire agreement of the parties and therefore parol evidence should be admissible.

This argument fails in the face of the unchallenged existence of the integration clause in the MSA. That is, the pre-contract discussion as to the weather contingencies do

18

not vitiate the meaning of the integration clause or the provision in the ITB placing costs arising from weather delays on the contractor. (ITB, Doc. 83, Ex. 32 at 2.08(8)(a)).

In sum, because Plaintiff's fraud claim is barred by the parol evidence rule, the Court will grant the Access Defendants' Motion for Summary Judgment as it pertains to Count XI of Plaintiff's Complaint.

### B. Breach of Contract – Weather Claim

Plaintiff first alleges that it is entitled to damages it suffered because of weather related delays experienced during pipeline construction. (Doc. 83 at ¶ 122; Doc. 96 at ¶ 122). This claim is based on an alleged pre-contract oral agreement Plaintiff entered into with the Access Defendants whereby Plaintiff agreed to remove all its winter contingencies from its bids on the four projects and the Access Defendants agreed to assume all the risk of any cost incurred to Plaintiff because of weather. (Doc. 96 at ¶ 123). In their Motion, the Access Defendants argue that Plaintiff's claim is barred by the express terms of the contracts. (Doc. 82 at 14-17). Specifically, they point to a provision in the ITB which states that the Access Defendants "will not be held monetarily responsible for weather delays or weather shutdowns. Crew shut down due to weather delays [are] at [Plaintiff's] expense." (ITB, Doc. 83, Ex. 32 at 2.08(8)(a)).

Plaintiff argues that the contract language was modified by its agreement with Mr. Edmonds, who was acting on behalf of the Access Defendants. (Doc. 95 at 16-17). As discussed above, however, because the four contracts are fully integrated and cover the

topic of weather delays or shutdowns, the parol evidence rule bars any evidence of **prior** oral agreements contradicting the terms of the written contracts. Thus, Plaintiff's claim cannot survive based on the alleged oral agreements that occurred before Plaintiff's bids were accepted by the Access Defendants.

However, Plaintiff also argues that the four contracts were orally modified **after** Plaintiff's bids were accepted by the Access Defendants. "It is axiomatic that the parol evidence rule, which prohibits the admission of oral evidence to vary or contradict a written contract simply does not apply to or prohibit a subsequent modification of a written contract 'by writings or by words or by conduct or by any combination of these.'" *House of Pasta, Inc. v. Mayo*, 449 A.2d 697, 704 (Pa. Super. Ct. 1982) (quoting *Levicoff v. Richard I. Rubin and Co.*, 196 A.2d 359, 362 (1964)); *Wagner*, 136 A.2d at 83-84. Specifically, Plaintiff claims that "on multiple occasions, including in October of 2012, November of 2012, January of 2013, and July of 2013, the Access Defendants orally agreed to compensate [Plaintiff] for any delays and/or losses because of weather conditions and stand downs." (Doc. 95 at 16). In their reply brief, the Access Defendants argue that Plaintiff failed to provide both clear and convincing evidence of the modification and evidence of any consideration Plaintiff provided for the modification. (Doc. 115 at 22). Viewing the evidence in a light most favorable to Plaintiff, there is a dispute of material fact as to whether the four contracts were modified after Plaintiff's project bids were accepted by the Access Defendants and the four contracts were formed.

As discussed above, the last of the four contracts was formed when the Access Defendants accepted Plaintiff's bid on the Zaplok West Project on November 21, 2012. In his deposition testimony, Mr. Edmonds testified that, in July of 2013, he went to a meeting with Plaintiff and the Access Defendants where he "confirm[ed] that we had agreed to remove the contingencies and that Access would take on some of that risk." (Deposition of Keith Edmonds, Doc. 96, Ex. 9 at 83-84). Mr. Edmonds testified that, after the bids were accepted, it was his understanding that Plaintiff and the Access Defendants would look at weather related issues "on a case by case basis" and that if an issue arose, Plaintiff "would submit a request for change through our normal procedures and then it would be reviewed from there as to the reasoning and the quantity of the change." (Id. at 79-80).

Jerrold Gill also testified that he "heard Keith Edmonds say that, yes, STI removed all weather contingencies out of all winter work for Access and that they would compensate STI for those weather days if the weather did in fact hit." (Deposition of Jerrold Gill, Doc. 96, Ex. 10 at 208). When asked when this occurred, Mr. Gill stated that it was in July of 2013. (Id.). Further, Mr. Gill's testimony also contains the following exchange:

Q . . . So when was this agreement that you would be compensated for loss --
you know for weather impacts finalized?
A I would believe after [the Zaplok West] project was awarded.

(Id. at 264). Viewing the above in a light most favorable to Plaintiff, there is a triable issue as to whether the written agreements were subsequently modified by an oral agreement.

In their reply brief, the Access Defendants argue that Mr. Edmonds's testimony on this matter was in response to confusing and ambiguous questions asked by Plaintiff. (Doc. 115 at 23). The Access Defendants point to other sections of Mr. Edmonds's testimony where they contend that Mr. Edmonds clarifies that only the Zaplok West project had any weather contingencies. (*Id.* at 23-24). The Access Defendants list the evidence they contend a jury would have to believe and what evidence a jury would have to reject to find for the Plaintiff. (*Id.* at 24-27). Thus, they argue, Plaintiff's accusation of oral agreements are implausible and should be rejected. (*Id.* at 27). On summary judgment however, "'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)); *see also Anderson*, 477 U.S. at 255. As discussed above, there is sufficient evidence in the record for a reasonable jury to conclude that a subsequent modification of the four contracts occurred through an oral agreement. The Court will not determine on summary judgment which portions of Mr. Edmonds's testimony, if any, the factfinder should credit.

The Access Defendants do concede that one of the four contracts—the Zaplok West contract—contained an exception to the general weather provision in the ITB. (Doc. 82 at 15). Specifically, Plaintiff's bid on that contract, which was accepted by the Access Defendants, states "Access will guarantee up to $1,000,000.00 stand down fee for

inclement non working weather conditions as agreed upon between Access and [Plaintiff] at the time of incident for the West Side Zap-Lok package. The day rate for this 'stand down' will be invoiced at a daily rate of $39,000 per spread." (Zaplok West Final Bid Proposal, Doc. 83, Ex. 46). The parties agree that the Access Defendants have already paid Plaintiff $1,000,000 for weather related shut downs on the Zaplok West project. (Doc. 83 at ¶ 129; Doc. 96 at ¶ 129). The Access Defendants accordingly argue that because they have already paid the $1,000,000 for weather related delays on this project, there is no issue for trial. As discussed above, however, there are still disputes of material fact as to whether this written contract was modified, or any of the other written contracts were modified, by an oral agreement after the Plaintiff's bid was accepted.

The Access Defendants next argue that Plaintiff's weather related claims must fail because Plaintiff cannot prove damages with reasonable certainty. To prove damages in a breach of contract claim "a plaintiff must give a factfinder evidence from which damages may be calculated to a 'reasonable certainty.'" *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225-26 (3d Cir. 2003) (quoting *ATACS Corp. v. Trans World Commc'n, Inc.*, 155 F.3d 659, 668 (3d Cir. 1998)). "At a minimum, reasonable certainty embraces a rough calculation that is not 'too speculative, vague or contingent' upon some unknown factor." *ATACS Corp.*, 155 F.3d at 669-70 (quoting *Spang & Co. v. U.S. Steel Corp.*, 545 A.2d 861, 866 (Pa. 1988)). "If a plaintiff is able to prove a breach of contract but can show no damages flowing from the breach, the plaintiff is entitled to recover nominal damages." *Thorsen v. Iron &*

23

*Glass Bank*, 476 A.2d 928, 931 (Pa. Super. Ct. 1984); *see also Scobell Inc. v. Schade*, 688

A.2d 715, 719 (Pa. Super. Ct. 1997). "A grant of summary judgment on the sole basis of

absence of provable damages, therefore, is generally improper." *Thorsen*, 478 A.2d at 931.

Here, even assuming that Plaintiff cannot prove damages with reasonable certainty,

summary judgment would still be inappropriate. *See Zeno v. Ford Motor Co.*, 480 F. Supp.

2d 825, 834 (W.D. Pa. 2007) ("In light of the law of Pennsylvania allowing nominal damages

for a breach of contract, summary judgment cannot be granted for failure to show

damages."); *Wolfe v. Allstate Prop. & Cas. Ins. Co.*, 790 F.3d 487, 497-98 (3d Cir. 2015).

Even if the case law were not so, the Court would not grant summary judgment on

this basis. The Access Defendants' argument is based on their assertion that Plaintiff

calculated its damages based on the figure of $39,000 "per day per spread," a figure which

the Access Defendants contend is limited to the Zaplok West contract and is capped at

$1,000,000. However, this contention is not undisputed as evidenced by the deposition

testimony of Keith Edmonds:

> Q. Did you have the authority to accept the 39,000 per day per spread?
> A. Yes.
> Q. And so I'm clear, the way that arrangement worked, that agreement
> worked I should say, for any days that were lost because of weather, STI was
> authorized to bill 39,000 per day per spread?
> A. Correct.
> Q. And you had the authorization to negotiate that term.
> A. Yes.
> Q. If I were to represent to you that STI is claiming damages in the amount of
> $15,000,000.00 for lost work from weather related issues, does that sound
> reasonable to you?
> BY ATTORNEY WHITE: Object to the form.

A. That sounds high.

(Deposition of Keith Edmonds, Doc. 96, Ex. 9 at 90-91). It may be that the daily rate of

$39,000 "per day per spread" will be shown at trial to be limited to the Zaplok West contract,

but it is not immediately clear from the above cited testimony that Keith Edmonds limited his

testimony about the $39,000 "per day per spread" to the Zaplok West contract. Thus, this is

a question for the jury. Similarly, it is also unclear about whether the above quoted

deposition testimony refers to pre-contract discussions that led to the inclusion of the

$39,000 "per day per spread" language in the Zaplok West contract or whether the

agreement Mr. Edmonds references was made as a post-contract modification covering the

Access Defendants' other projects. Consequently, this is also a dispute of fact for the jury.

Finally, the Access Defendants argue that the claim is barred because Plaintiff failed

to submit timely change orders for the weather related delays as required by the contract.

Because Plaintiff's claim is based on an oral agreement, the terms of which must be found

by the jury, the Court will not determine whether Plaintiff is confined by the change order

provision on these claims or whether the oral agreement affected this provision as well.

Further, *Wagner* makes clear that the Access Defendants' defense is no defense at all

where no express amount may have been agreed to in advance:

> Accordingly we conclude that Wagner has the right to an opportunity to
> submit proof in substantiation of his averments that Graziano authorized his
> agent to waive terms of the written agreement, for such proof would make
> Graziano liable for the reasonable value of the service rendered and materials
> furnished, no express amount having been agreed to in advance.

25

*Wagner*, 136 A.2d at 85.

The Court, therefore, will deny the Access Defendants' Motion for Summary Judgment as it pertains to Plaintiff's weather claims.

### C. Breach of Contract – Hurricane Sandy Claim

The Access Defendants next argue that this Court should grant summary judgment in their favor with regard to Plaintiff's claim for damages it suffered as a result of Hurricane Sandy. (Doc. 82 at 18-19). In support, they argue that the claim is barred for the same reasons the general weather claims are barred, and, additionally, the *force majeure* clause in the MSA bars the claim.[5] Initially, the Court rejects the Access Defendants' first argument for the same reason cited in the prior section.

As to Defendants second argument, the *force majeure* clause in the MSA provides:

> . . . neither Company nor Contractor shall be responsible to the other for any delay, damage or failure caused by or occasioned by a Force Majeure Event. As used in this Contract, "Force Majeure Event" includes: acts of God, action of the elements, warlike action, insurrection, revolution or civil strife, laws, rules and regulations of any governmental authorities having jurisdiction in the premises or of any other group, organization or informal association (whether or not formally recognized as a government); acute and unusual labor or material or equipment shortages, or any other causes (except financial) beyond the control of either party.

(MSA, Doc. 83, Ex. 26 at 20). This provision, however, does not specifically identify a hurricane as a *force majeure* event. "The court, as a matter of law, determines the

---

[5] The Access Defendants also argue that Plaintiff is unable to prove damages with reasonable certainty. (Doc. 82 at 19). As discussed in the prior section, because Pennsylvania law allows nominal damages in a breach of contract action, granting summary judgment on the basis of inability to prove damages is improper. *Thorsen*, 478 A.2d at 931; *Zeno*, 480 F. Supp. 2d at 834; *Wolfe*, 790 F.3d at 497-98; *Wagner*, 136 A.2d at 85. Thus, the Court rejects the Access Defendants' argument on this basis.

existence of an ambiguity." *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). "A contract is ambiguous if it is capable of being understood in more than one sense." *Id.* "If the court determines that a given term in a contract is ambiguous, then the interpretation of that term is a question of fact for the trier of fact to resolve in light of the extrinsic evidence offered by the parties in support of their respective interpretations." *Sanford Inv. Co. v. Ahlstrom Machinery Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999).

While a hurricane certainly could be a *force majeure* event, reasonable minds could differ as to whether the clause in the MSA covers hurricanes when it does not identify them by name. The terms "acts of God" and "action of the elements" are not specific enough for this Court to conclude, as a matter of law, that they are not "reasonably susceptible of different constructions and [not] capable of being understood in more than one sense." Thus, the Court concludes that the above cited provision is ambiguous as to whether it includes hurricanes within the definition of a *force majeure* event. As such, its meaning is for the trier of fact to determine. *Sanford Inv. Co.*, 198 F.3d at 421.

Further, it is also not clear that the oral agreement regarding the Access Defendants sharing the cost of the weather would not include the costs associated with Hurricane Sandy. Hurricane Sandy was a weather event. As there is still an issue of fact as to the existence of a post-contract oral agreement concerning sharing the cost of weather, there is still an issue of fact as to whether such an agreement would include sharing the costs associated with Hurricane Sandy.

Case 3:13-cv-02923-RDM   Document 126   Filed 03/06/17   Page 28 of 50

Plaintiff also claims damages as a result of complying with a "Hurricane Preparedness Plan" that the Access Defendants issued after the relevant contracts were in place. (Doc. 95 at 24-25). Indeed, the record supports the fact that, in anticipation for Hurricane Sandy, the Access Defendants issued a Hurricane Preparedness Plan which required Plaintiff to perform extra work not anticipated in the contract. (Doc. 95-1 at 5-7; Deposition of Jerrold Gill, Doc. 96, Ex. 23 at 53-54). The Access Defendants respond that Plaintiff failed to submit a change order for any out of scope work within the time detailed by the contract. (Doc. 115 at 32). The Access Defendants cite to the notice provision in the ITB which states "[o]ut of scope work needs to have written approval from COMPANY Management prior to executing. If CONTRACTOR executes any out of scope work without COMPANY Management approval, the cost of the work could be at CONTRACTOR expense if the change order is not approved." (ITB, Doc. 83, Ex. 32 at § 2.09).

Assuming the Access Defendants are correct and Plaintiff did not timely submit a change order, this deficiency is not fatal to Plaintiff's claim. A similar situation occurred in *James Corporation v. North Allegheny School District*. 938 A.2d 474, 478 (Pa. Commw. Ct. 2007). There, after the execution of a contract, a school district directed a contractor to perform some excavation work by hand. *Id*. The contract at issue had a change order provision requiring the contractor to give advanced notice of any extra work and get advanced approval. *Id*. Nevertheless, despite not submitting a timely change order, the

28

Court allowed the contractor's claim to procced because the "School District demanded the hand excavation work." Id.

Here, the Access Defendants claim that they would be prejudiced by allowing the claim now because "they had no opportunity to track and verify Plaintiff's alleged out-of-scope work, self-perform the work to save costs, or consider alternative measures." (Doc. 115 at 33). This argument ignores the fact that the Access Defendants directed the Plaintiff to perform the extra work. (Doc. 95-1 at 5-7). The Access Defendants cannot direct Plaintiff to perform extra work and then complain they did not have an opportunity to assess whether Plaintiff was the most cost efficient option to perform said work.

Accordingly, the Court will deny the Access Defendant's Motion for Summary Judgment on this claim.

### D. Breach of Contract – "Slow Production" Claim

Plaintiff alleges that the Access Defendants are liable for damages it incurred due to its own slow production caused by a variety of external factors. The Access Defendants have moved for summary judgment for two reasons: (1) Plaintiff did not assert a breach of contract claim for slow production days in its complaint; and (2) Plaintiff "cannot identify the basic allegation supporting this claim, let alone show evidence supporting its theory of recovery." (Doc. 82 at 19-21). Regarding the Access Defendants' first argument, the Court finds that Plaintiff's theory of recovery is fairly encompassed in its breach of contract claim.

As to the Access Defendants' second argument, to the extent Plaintiff is seeking compensation for weather related slowdowns, there is an issue of fact as to whether Plaintiff's post contract oral agreement with Mr. Edmonds would allow Plaintiff to recover these costs. *See supra Section III.B.* Additionally, the record supports Plaintiff's claim that its work was slowed down, in part, because of the Access Defendants. More specifically, one of the Access Defendants' employees testified that there was some delay associated with Access failing to deliver pipe on time. (Deposition of Tim Peck, Doc. 96, Ex. 7 at 119-20). Further, the same employee testified that there were delays because of problems with the coating on some of the pipes that Access provided. (*Id.* at 123-25). Because the ITB provides that the Access Defendants will provide the pipe for the projects, (ITB, Doc. 83, Ex. 32 at § 2.08(1)), Plaintiff is entitled to damages it suffered from delays that are attributable to the Access Defendants' failure to act in an essential manner under the contracts. *See Coatesville Contractors & Eng'rs, Inc. v. Borough of Ridley Park*, 506 A.2d 862, 867-68 (Pa. 1986). The above cited portions of the record demonstrate that there is a material issue of fact as to whether the Access Defendants were responsible for some of the delay Plaintiff experienced.

Therefore, the Court will deny the Access Defendants' Motion for Summary Judgment on this claim.

## E. Breach of Contract – "Move-Around" Claim

Next, the Access Defendants argue that they cannot be held liable for "move-around" claims because those claims are only asserted against the Chesapeake Defendants. (Doc. 82 at 22). Plaintiff agrees that there is no "move-around" claim asserted against the Access Defendants. (Doc. 95 at 30). The Court can obviously not grant summary judgment in favor of the Access Defendants on a claim that is not brought against the Access Defendants. Accordingly, the Court will deny the Access Defendants' motion on this claim. The Access Defendants go on to argue that Plaintiff should not be allowed to amend its Complaint to add the Access Defendants to this claim. (Doc. 82 at 22-23). There is, however, no pending motion to amend and therefore this argument is moot.

## F. Breach of Contract – Rock Picking Claim

Plaintiff is also claiming damages for costs it claims it experienced from picking up rocks from the work sites. Plaintiff claims that this rock picking was required under the Land Operations Worksheet ("LOW").[6] Plaintiff claims that the LOWs were provided to it after Plaintiff was awarded the bid and that, therefore, the LOWs requirements are out of scope work. (Doc. 96 at ¶ 155). Plaintiff further claims that the Access Defendants required it to pick up rocks outside of the construction right of way. (*Id.*). The Access Defendants argue that Plaintiff's claim is barred by the terms of the contracts. (Doc. 82 at 24-26). Further, they argue that even if the claim was not barred, Plaintiff's claims for rock picking are

---

[6] A LOW "is a contract document reflecting specific demands of an owner of property with respect to work being performed on the owner's parcel." (Doc. 83 at ¶ 156; Doc. 96 at ¶ 156).

untimely, as Plaintiff submitted a change order request two days after the rock picking was performed. (*Id.* at 26).

There are two relevant provisions in the contracts with regard to rock clean-up. First, the Scope of Work ("SOW") documents provide that Plaintiff is responsible for "all equipment, materials, labor, plant and services necessary to clear the right-of-way of all waste, materials, debris, and rock resulting from operations in accordance with all applicable permits." (Doc. 83 at ¶ 157; Doc. 96 at ¶ 157). Further, the Chesapeake Pipeline Construction Manual—which is part of the each of the four contracts—states "[a]ny loose rock encountered during grading, trenching, boring, and other work that is not backfilled into the ditch, shall be removed from the right-of-way during cleanup operations." (Chesapeake Pipeline Construction Manual, Doc. 83, Ex. 34 at § 5.1(B)).

Plaintiff seems to concede that the SOW contract provision applies to the removal of "rock on the [right of way] resulting from operations in accordance with all applicable permits." (Doc. 96 at ¶ 157; Doc. 95 at 31). Thus, Plaintiff could not recover damages for picking up rocks in the right of way that resulted from its operations. Nevertheless, Plaintiff argues that its claims are recoverable because one of its employees, Scott Sisco, testified that the Access Defendants "had us picking up rocks in wooded areas." (Deposition of Scott Sisco, Doc. 96, Ex. 3 at 21, 23). The record is unclear as to whether these wooded areas are outside of the right of way. Thus, viewing the evidence in a light most favorable to Plaintiff, a dispute of fact exists as to whether the Access Defendants directed Plaintiff to

pick up rocks outside of the right of way. Further, contrary to the Access Defendants' assertion, because this rock removal was at the direction of the Access Defendants, failure to submit a change order is not fatal to the claim. *James Corp.*, 938 A.2d at 478.

The Access Defendants rebut that the "wooded area" that Mr. Sisco referred to was not outside of the right of way. (Doc. 115 at 39). The Access Defendants, however, provide no citation to the record to support their assertion. Instead, this is merely a request for the Court to draw an inference from the evidence that is favorable to the Access Defendants. The Court, of course, cannot do this on summary judgment. *Big Apple BMW, Inc.,* 974 F.2d at 1363.

The Access Defendants next argue that the change order requests that Plaintiff submitted specify that it was requesting payment for rocks removed from inside the right of way. (Doc. 115 at 38-39). Thus, they argue, Plaintiff's contention here is simply an attempt to change its argument to avoid summary judgment. (*Id.* at 40). Nevertheless, because submission of the change orders is not a prerequisite for maintaining its claim, *James Corp.*, 938 A.2d at 478, the fact that Plaintiff's change orders specify the rocks were inside of the right of way does not eliminate the existence of the dispute regarding whether the Access Defendants directed Plaintiff to pick up rocks outside of the right of way.

Thus, the Court will deny the Access Defendants' Motion for Summary Judgment on this claim.

## G. Breach of Contract – Installation of Fabrication Items Claim

Plaintiff has also claimed it is entitled to payment for the installation of certain

fabricated items with regard to three of the four contracts. (Doc. 82 at ¶ 163; Doc. 96 at ¶

163). The Access Defendants argue that the language of the contracts bar Plaintiff's claim.

(Doc. 82 at 26-30). Plaintiff argues that the operative language in the contracts supports its

claim. (Doc. 95 at 35-39).

> The ITB states, in relevant part, that

> [t]he prices in a Bid shall be in legible inked numbers and words where
> applicable, and price total shall include all materials, appliances, equipment,
> labor, plant and services (including markup if applicable) required to complete
> the scope of work. . . .

> . . .

> Bidder is to evaluate the job in its entirety and should develop their own
> estimation of quantities for completing the scope of work. All payments for
> unit price items will be made on actual quantities as measured in the field.

(ITB, Doc. 83, Ex. 32 at § 2.02). That document then defines the scope of work as including

documents titled "scope of work" ("SOW"). (*Id.* at § 2.08). The three SOWs[7]—which all

---

[7] To be precise, there are more than three SOWs incorporated into the three contracts at issue.
(Affidavit of Attorney Mazzocco, Doc. 83, Ex. 37). As discussed above, there are four contracts in this
case, one for each of the following main projects: Black West, Zaplok East, Welded West, and Zaplok
West. Each of those four contracts pertain to multiple smaller projects, many of which have a
corresponding SOW. (Doc. 83 at ¶¶ 77, 78, 90, 91, 102, 103, 114, 115; Doc. 96 at ¶¶ 77, 78, 90, 91, 102,
103, 114, 115). The Access Defendants have submitted four SOWs with their Motion for Summary
Judgment, one for each of the four contracts. (Black West SOW, Doc. 83, Ex. 38; Zaplok East SOW, Doc.
83, Ex. 41; Welded West SOW, Doc. 83, Ex. 44; Zaplok West SOW, Doc. 83, Ex. 47). The parties agree
that these four SOWs are identical, in relevant parts, to the SOWs that were not submitted to the Court.
(*Id.*). Further, one of the four SOWs submitted by the Access Defendants is not relevant to Plaintiff's claim
because it concerns the Black West contract, and Plaintiff is only claiming costs incurred during the Zaplok
East, Welded West, and Zaplok West projects. (Doc. 83 at ¶ 163; Doc. 96 at ¶ 163).

agree are part of the three contracts at issue—in turn, provide different categories of work that fall within the larger scope of work such as mobilization, demobilizations, base lay, and Horizontal Directional Drilling.  (Zaplok East SOW, Doc. 83, Ex. 41; Welded West SOW, Doc. 83, Ex. 44; Zaplok West SOW, Doc. 83, Ex. 47).  The SOWs further specify what costs are included in each category.  (Zaplok East SOW, Doc. 83, Ex. 41; Welded West SOW, Doc. 83, Ex. 44; Zaplok West SOW, Doc. 83, Ex. 47).  Four categories—"Pre-Fabricated Pig Trap Installation," "Installation Meter Assembly," "Installation of Discharge Spool: Stand-Alone for Futures," and "Installation of Above Ground Valve (A.G.V.)"—contain the following language: "This item will only be paid once per unit.  Payment shall be at the completion of installation, which is at COMPANY's discretion.  The cost for this item is mutually exclusive and will not be paid for under any other items."  (Zaplok West SOW, Doc. 83, Ex. 47 at 22-24).[8]  Finally, the parties have stipulated that the fabrication items that Plaintiff seeks to bill for were identified on the project drawings and were part of the applicable scope of work for those projects.  (Fabricated Item Stipulation, Doc. 83, Ex. 58).

The Access Defendants argue that Plaintiff is not entitled to compensation above the contract price because, per the ITB, Plaintiff submitted a bid that should have included the cost of the installations at issue.  (Doc. 82 at 26-30).  Plaintiff first responds that, because

---

[8] The Court notes that only one of the SOWs that the Access Defendants submitted with their Motion is complete. (Zaplok West SOW, Doc. 83, Ex. 47).  The other two relevant SOWS are missing pages where the above quoted language would presumably be found.  (Zaplok East SOW, Doc. 83, Ex. 41; Welded West SOW, Doc. 83, Ex. 44).  Nevertheless, Plaintiff has not argued or alleged that this omission is at all material to this Motion, so the Court will assume it is not.  (Affidavit of Attorney Mazzocco, Doc. 83, Ex. 37).

the SOWs specify that the fabricated items were to be paid on a unit price basis, Plaintiff was not required to include installation of those items in its bid because the ITB states "[a]ll payments for unit price items will be made on actual quantities as measured in the field." (Doc. 95 at 36).  Plaintiff further argues that, at the very least, the contracts are ambiguous and that the language should be construed against the drafter.  (Id.).

The Court agrees that the operative contract language "is reasonably susceptible of different constructions and capable of being understood in more than one sense." Hutchison, 519 A.2d at 390.  Specifically, the ITB, in the same section that instructs that "price totals shall include all materials, appliances, equipment, labor, plant and services (including markup if applicable) required to complete the scope of work," also states that "[a]ll payments for unit price items will be made on actual quantities as measured in the field," ("Unit Price Item Clause").  (ITB, Doc. 83, Ex. 32 at § 2.02).  As discussed above, the four categories of fabricated items that Plaintiff is seeking compensation for specify that they will be "paid once per unit."  (Zaplok West SOW, Doc. 83, Ex. 47 at 22-24).  Thus, one reasonable interpretation of these clauses together is that the four categories of fabricated items are unit price items.  Further, since all unit price items are paid on actual quantities as measured in the field, a reasonable jury could find that those items, under the terms of the four contracts, did not need to be included in Plaintiff's bids because they would be paid for separately, after "completion of installation."

36

The Access Defendants argue that the Unit Price Item Clause in the ITB "is simply a

billing instruction for its fabrication work." (Doc. 82 at 28). However, this merely

underscores the ambiguity. Each party has offered its interpretation of what is without

question ambiguous language. Consequently, these competing interpretations of the

contract language present questions for the jury and are not appropriate for resolution on

summary judgment. *Sanford Inv. Co.*, 198 F.3d at 421.

Defendants further argue that Plaintiff already invoiced these items within its base

lay price and also did not submit any change order requests. (Doc. 82 at 29-30). The only

portion of the record that the Access Defendants point to, however, is at best unclear as to

whether Plaintiff invoiced the fabricated items within its base lay price:

Q. So when you billed for these items, did you bill for these fabricated items
originally in your invoices.
A. I never created an invoice for the fabricated items.
Q. But you did have invoices from the beginning for HDD and rock ditching in
addition to the base lay rate; correct?
A. I did. That's correct.
Q. So at some point, according to your interpretation, you felt that these
fabrication items should also be added as a separate pay item; correct?
A. When it was brought to my attention that it was listed in the scope of [sic]
this way.

(Deposition of Drew Hazlewood, Doc. 83, Ex. 90 at 309). Although Mr. Hazlewood

discusses invoices for the fabricated items, he does not say that the cost to install the

fabricated items was built into Plaintiff's base lay price.

As to the Access Defendants' second argument—that Plaintiff never submitted any

change order requests—the contract provision that the Access Defendants invoke applies to

out of scope work. (ITB, Doc. 83, Ex. 32 at § 2.09) ("Out of scope work needs to have written approval from COMPANY Management prior to executing."). As the Access Defendants have pointed out, however, the parties have stipulated that the fabrication items that Plaintiff seeks to bill for were identified on the project drawings and were part of the applicable scope of work for those projects. (Fabricated Item Stipulation, Doc. 83, Ex. 58). Thus, the change order provision would not seem to apply to these circumstances because it was not "out of scope work."

Therefore, the Court will deny the Access Defendants' Motion for Summary Judgment as it pertains to this claim.

## H. Breach of Contract – Resetting of Pig Traps Claim

The Access Defendants next move for summary judgment on Plaintiff's claim for damages resulting from resetting the "pig traps"[9] following the nitrogen testing on certain pipelines. (Doc. 82 at 30-31; Doc. 83 at ¶ 182). The Access Defendants argue that the contracts specify that Plaintiff's bid should include the cost of setting up functional pig traps, that nitrogen testing of the line was required, and that they could only be paid once per pig trap. (Doc. 82 at 30-31). Consequently, they argue, the contracts bar any additional claims of compensation for resetting the pig traps after nitrogen testing. (Id.).

---

[9] "Pipeline pigging is a maintenance tool that ensures that the pipeline is running smoothly. Pipeline pigs are introduced into a pipeline via a pig trap, which trap includes a launcher and receiver." W&T Energy VI, LLC v. Dauphin Island Gathering Partners, 2016 WL 7406748, at *2 n.4 (S.D. Tex. 2016).

The contracts specify that "[c]ost for a single pig trap installation shall include all equipment, material, labor, plant and services necessary to install a functional Pig Trap per Company Standards. . . . Final bolt-up and torqueing are included in this cost. This item will only be paid once per unit." (Zaplok East SOW, Doc. 83, Ex. 41 at 22; Welded West SOW, Doc. 83, Ex. 44 at 21). Further, the scope of work "[s]hall include all equipment, materials, labor, plant and services necessary to verify, clean and test all pipe installed under this Contract . . . . All COMPANY supplied launchers will require replacement of gaskets, re-torqueing of bolts and 10 minute nitrogen test to 10% above operating pressure . . . ." (Zaplok East SOW, Doc. 83, Ex. 41 at 16; Welded West SOW, Doc. 83, Ex. 44 at 15).

First, as discussed in the prior section, the contracts are ambiguous as to how unit price items will be billed and paid. Additionally, with regards to the pig trap claim, Jerrold Gill's deposition testimony contains the following exchange about resetting the pig traps:

> Q. What -- did you discuss this specific change order request with Access?
> A. Yes. And I also think -- we had this conversation in one of our meetings probably with myself, Paul Spence, Rick Powell, Tim Peck and Rick agreed also that this was an extra set.
> Q. They all agreed?
> A. This -- this is one of the particular ones that, I believe, that they agreed to --
> Q. Okay.
> A. -- in conversation.

(Deposition of Jerrold Gill, Doc. 96, Ex. 11 at 223-25). Thus, viewing the evidence in a light most favorable to Plaintiff, there is an issue of fact as to whether Access agreed to pay for the resetting of the pig traps as extra work.

The Access Defendants also argue that they are entitled to summary judgment on

this claim because Plaintiff failed to submit a timely change order request for this work.

(Doc. 82 at 31). The Access Defendants, however, fail to cite to anything in the record that

establishes that Plaintiff did not submit a timely change order request. Accordingly,

because the Access Defendants failed to provide record support for their argument, the

Court rejects it. (Doc. 77).

Therefore, the Court will deny the Access Defendants' Motion for Summary

Judgment as it pertains to this claim.

## I. Breach of Contract – Retainage

Next, the Access Defendants have moved for summary judgment with regards to

Plaintiff's claim that the Access Defendants have unlawfully withheld retainage of 10% from

its progress payments. (Doc. 82 at 31). The only clause in the contracts that addresses

retainage is found in the SOWs. That clause, found in the section regarding the restoration

of the right of way to its prior condition, states

> [w]hen restoration is in noncompliance with Company Standards and
> Environmental Health and Safety Laws and Regulations the project retainage
> fee shall be withheld. The project retainage fee shall be released upon (1)
> restoration compliance acceptable to COMPANY, (2) 70% coverage of
> restoration vegetation requirement, (3) All Erosion Control Measures
> removed, (3) [sic] final billing has been submitted by CONTRACTOR, and (4)
> All disputes have been resolved.

(Black West SOW, Doc. 83, Ex. 38 at 18). The Access Defendants allege that the parties

agreed to a 10% retainage fee before Plaintiff submitted its bid, and that Plaintiff's action

during the course of the project showed that the Access Defendants and Plaintiff had such an agreement. (Doc. 82 at 32-33). Finally, the Access Defendants argue that their continued withholding of this money is proper because all disputes have yet to be resolved. (*Id.* at 33-34).

Even assuming that Plaintiff and the Access Defendants agreed to the 10% retainage, the Court finds that summary judgment on this claim is improper. As discussed above, only one provision in the contracts allow the Access Defendants to withhold the project retainage, and then only "[w]hen restoration is in noncompliance." The Access Defendants have failed to cite to anywhere in the record, except their own pleadings, that demonstrates that Plaintiff's restoration work was not in compliance with the contracts. (Doc. 77). As this noncompliance is required to trigger the Access Defendants' ability to withhold the retainage, at the very least there is an issue of fact as to whether the Access Defendants' continued withholding is proper under the contracts. Thus, the Court will deny the Access Defendants' Motion for Summary Judgment on this claim.[10]

## J. Breach of Contract – Winter Construction Plan Claim

In Plaintiff's next claim, it seeks damages it alleges it suffered as a result of complying with the 2013 Winter Construction Plan issued by the Access Defendants in January 2013—after Plaintiff's bids were accepted and while construction was under way.

---

[10] To the extent that the Access Defendants rely on the provision in CASPA to support their continued withholding, that statute only allows the Access Defendants to "withhold payment for deficiency items *according to the terms of the construction contract*." 73 P.S. 506(a) (emphasis added). Thus, they would still only be able to withhold the retainage when restoration is not in compliance.

41

(Doc. 83 at ¶ 202-04; Doc. 96 at ¶ 202-04). The Access Defendants put forth three arguments as to why they are entitled to summary judgment on this claim: (1) the 2013 Winter Plan did not impose any additional requirements above what the contracts already required; (2) the 2013 Winter Plan was identical to the 2011 Winter Plan, which was part of each of the four contracts; and (3) Plaintiff did not object to any out of scope work and the claim is untimely.[11] (Doc. 82 at 34-40). The Court will address each argument in turn.

The Access Defendants first assert that the 2013 Winter Plan merely provided guidelines for complying with the other provisions of the contracts. (Doc. 82 at 35). The language contained in the plan, however, is not worded permissively. Instead, the plan states "[t]o maintain the environmental objectives set forth in project permits and the Erosion and Sediment Control Plans (ESCPs), [Appalachia Midstream Services] has drafted the following measures and procedures to implement during construction that occurs throughout the winter construction period." (2013 Winter Construction and Stabilization Plan, Doc. 83, Ex. 62 at § 1.0). In the snow management section, the plan state "[t]he following will be implemented after significant snow events." (*Id.* at § 2.0). In another section, the plan states "[t]he following requirements will be implemented during frozen soil conditions and periods of anticipated snow fall." (*Id.* at § 4.0). Thus, it does not appear that the winter plan was just "general guidelines" as the Access Defendants assert.

---

[11] The Access Defendants also argue that Plaintiff is unable to prove damages with reasonable certainty. (Doc. 82 at 39-40). As discussed in section III.B above, because Pennsylvania law allows nominal damages in a breach of contract action, granting summary judgment on the basis of inability to prove damages is improper. *Thorsen*, 478 A.2d at 931; *Zeno*, 480 F. Supp. 2d at 834; *Wolfe*, 790 F.3d at 497-98; *Wagner*, 136 A.2d at 85. Thus, the Court rejects the Access Defendants' argument on this basis.

Next, the Access Defendants argue that any requirement found in the 2013 Winter Plan is redundant of other contractual requirements already found in the contracts. (Doc. 82 at 35). Without going into the details of the Access Defendants' arguments, the Court notes that the Access Defendants have failed to show that every provision in the 2013 Winter Plan that Plaintiff is claiming damages under is duplicative of a contract provision already found in the four contracts. For example, Plaintiff is claiming damages for the cost of removing snow from the spoil piles. (Doc. 83 at ¶ 202). The 2013 Winter Plan states "[s]now will be removed from topsoil or spoil storage areas prior to using." (2013 Winter Construction and Stabilization Plan, Doc. 83, Ex. 62 at § 2.0). Although the Access Defendants cite to a provision in the contracts that define "snow management," they do not point to any specific provision that requires Plaintiff to remove snow from the spoil storage areas. Accordingly, the Court rejects the Access Defendants' argument that the 2013 Winter Plan, as a matter of law, imposes no additional requirements above what is already required in the contracts.

Turning to the Access Defendants' second argument, they content that the 2013 Winter Plan contained the same provisions as the 2011 Winter Plan, and that the 2011 Winter Plan was incorporated into each of the four contracts through (1) the definition of "Company Standards" in the SOWs, (2) the use of the term "Company Specifications" in the ITB, and (3) a reference in the "Clean-up" section of the SOWs. (Doc. 82 at 37-38). As discussed above, "under Pennsylvania law, '[i]ncorporation by reference is proper where the underlying contract makes clear reference to a separate document, the identity of the

separate document may be ascertained, and incorporation of the document will not result in surprise or hardship.'" *Chesapeake Appalachia, LLC*, 809 F.3d at 761 (alteration original) (quoting *Std. Bent Glass Corp.*, 333 F.3d at 447).

Here, there is no clear reference to the 2011 "Winter Construction and Stabilization Plan" in any of the four contracts. First, the ITB state that "COMPANY Standards" are part of the scope of work. (ITB, Doc. 83, Ex. 32 at § 2.08). The SOWs provides the following in its definition section:

> Company Standards – shall include all Bid Documents, Contract Documents, COMPANY Engineering and Construction Standards (to include but not limited to Reference B, Reference C, Reference D, Reference E)[12], COMPANY rules, and Environment Health and Safety Laws and Regulations. Shall also include but not [sic] limited to all local, state, federal standards, codes, and regulations. When conflict exist the most restrictive standard, code, or regulation shall take precedence. Failure to comply shall be at the cost of CONTRACTOR.

(Zaplok West SOW, Doc. 83, Ex. 47 at 3). Contrary to the Access Defendants' contention, this definition contains no "clear reference" to the 2011 Winter Construction and Stabilization Plan. Second, the ITB states that "COMPANY Specifications"—a term that does not appear to be defined anywhere—are part of the scope of work. (ITB, Doc. 83, Ex. 32 at § 2.08). This again is not a "clear reference to a separate document."

Finally, the SOWs, in the section on clean-up, state "[i]n the event clean-up is slowed due to winter weather conditions, the COMPANY winter stabilization standards will be

---

[12] These references are to specific documents, none of which is the 2011 Winter Construction and Stabilization Plan.

followed." (Zaplok West SOW, Doc. 83, Ex. 47 at 17). This too does not constitute a "clear

reference to a separate document." In fact, it is not even readily apparent that this provision

is referring to a document at all. The 2011 Winter Construction and Stabilization Plan has a

title page and is dated. If the Access Defendants wanted to incorporate it into the contracts,

they could have provided specific reference to its title or its date. Thus, the Court finds that

the 2011 Winter Construction and Stabilization Plan was not incorporated by reference into

the any of the four contracts. Because that document was not part of the contracts, it is

irrelevant that Plaintiff may have had the document in its possession prior to submitting its

bids or that the document is similar to the 2013 Winter Plan.

Lastly, the Access Defendants argue that Plaintiff did not object to any out of scope

work, and its claim is untimely. (Doc. 82 at 39-40). The only citations to the record the

Access Defendants provide in support of these arguments is (1) the undated "Winter Spec

Charges" document that Plaintiff provided them, and (2) the testimony of Mr. Gill in which he

states that he thinks the Winter Spec Charges document was given to the Access

Defendants at a meeting in June of 2013.[13] This evidence appears to establish that Plaintiff

submitted its Winter Spec Charges document to the Access Defendants sometime in June

of 2013. It fails to establish as a matter of law, however, that (1) Plaintiff did not object to

the out of scope work; or (2) that Plaintiff's claim is untimely because it never submitted

---

[13] All other citations in this section refer back to paragraphs in the Access Defendants' Statement of Material Facts that contain no citation to the record. (Doc. 83 at ¶¶ 226-28, 254). As the Access Defendants provided no record support for their factual assertions, the Court has disregarded them. *See* Local Rule 56.1; *see also* Doc. 77.

change orders for the change in the scope of work. Accordingly, the Court rejects these arguments.

Nevertheless, even if the Access Defendants could establish that Plaintiff never submitted change orders, their argument would still fail. Because the Access Defendants directed Plaintiff to conduct the extra work through the issuing of the 2013 Winter Plan, Plaintiff's failure to submit change orders is not fatal to its claim. *James Corp.*, 938 A.2d at 478.

Therefore, the Court will deny the Access Defendants' Motion for Summary Judgment as it pertains to this claim.

## K. Breach of Contract – Safety Stand Down Claim

Plaintiff's final claim under its breach of contract count seeks damages for delays due to the Access Defendants stopping work for alleged safety violations. (Doc. 83 at ¶ 229; Doc. 96 at ¶ 229). The Access Defendants argue that they are entitled to summary judgment on this claim because (1) the contracts bar Plaintiff's claim, and (2) Plaintiff consented to the shut downs. (Doc. 82 at 40-43).

The definition section of the relevant SOWs provide

Company Standards – shall include all Bid Documents, Contract Documents, COMPANY Engineering and Construction Standards (to include but not limited to Reference B, Reference C, Reference D, Reference E), COMPANY rules, and Environment Health and Safety Laws and Regulations. Shall also include but not [sic] limited to all local, state, federal standards, codes, and regulations. When conflict exist the most restrictive standard, code, or regulation shall take precedence. Failure to comply shall be at the cost of CONTRACTOR.

. . .

Inspector – any employee, third-party contractor or other representative designated by COMPANY as the person or persons responsible for the on-site inspection of the Work to determine if it is in compliance with quality, contractual and government standards. Inspectors have stop work authority for immediate safety or environmental controls.

(Zaplok East SOW, Doc. 83, Ex. 41 at 3; Welded West SOW, Doc. 83, Ex. 44 at 3; Zaplok West SOW, Doc. 83, Ex. 47 at 3). The Access Defendants argue that the above cited language, in conjunction with various federal, state, and local safety regulations, gives them the legal right to shut down Plaintiff's work to address any safety issues. (Doc. 82 at 40-41). They further cite the last sentence of the definition of "Company Standards" as evidence that any shut down they ordered was at Plaintiff's expense. Plaintiff argues that nothing in any of the contracts gives the Access Defendants the ability to shut down all projects because of a safety violation on an individual project. (Doc. 95 at 53-54).

The Court agrees that summary judgment is improper on this claim. Even assuming that the Access Defendants have the right to shut down projects for safety violations, the Access Defendants have pointed to no contractual provision that unambiguously allows them to shut down multiple other projects that have no safety violations based on a safety violation at a different project. Jerrold Gill testified that there was "multiple spreads over a 200-mile radius, three separate counties, and [Access was] wanting to shut all of it down instead of just the specific spread that had an incident." (Deposition of Jerrold Gill, Doc. 96, Ex. 11 at 100). Thus, there is an dispute of material fact as to whether the Access

Defendants did shut down multiple work sites for a safety violation that occurred elsewhere and whether the Access Defendants were allowed under any of the four contract to proceed in this manner.[14]

Next, the Access Defendants argue that Plaintiff cannot recover because it consented to the shut downs. (Doc. 82 at 41). The record, however, contains evidence that Plaintiff objected to the shut downs when they occurred and did not consider them legitimate. (Deposition of James Bender, Doc. 96, Ex. 2 at 158-159; Deposition of Brad Webb, Doc. 96, Ex. 4 at 49; Deposition of Jerrold Gill, Doc. 96, Ex. 11 at 95-96, 99-100; Deposition of Jerrold Gill, Doc. 96, Ex. 23 at 165-66). The Access Defendants argue that this evidence is disproved by several emails Plaintiff sent. (Doc. 82 at 41-42). On summary judgment however, "'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti*, 716 F.3d at 772 (quoting *Reeves*, 530 U.S. at 150); *see also Anderson*, 477 U.S. at 255. Thus, there are triable issues about whether the shut downs were warranted and whether Plaintiff consented to the shut downs.

---

[14] In their reply brief, the Access Defendants argue that they are still entitled to summary judgment because Plaintiff has based its claim on a contractual provision that is not in any of the contracts. (Doc. 115 at 49). This point, however, is irrelevant. If the Access Defendants prevented Plaintiff from performing the work under the contracts with no legal right to do so, Plaintiff may recover damages based on this positive interference. *See Henry Shenk Co. v. Erie Cnty.*, 178 A. 662, 665 (1935) ("[W]here an owner by an unwarranted positive act interferes with the execution of a contract . . . he will be liable for the damages resulting therefrom.").

Finally, the claims are not barred because Plaintiff failed to submit a change order. As the damages flow from the Access Defendants' alleged affirmative interference with the contract, not from out of scope work, the contracts' notice provisions are inapplicable.

Thus, the Court will deny the Access Defendants' Motion for Summary Judgment as it pertains to this claim.[15]

## L. CASPA Count

Lastly, the Access Defendants argue that they are entitled to summary judgment on the CASPA count because there was no breach of contract. (Doc. 82 at 45). Remedies under CASPA are available when "a contractor has established its contractual relationship with [the defendant] and has shown the [defendant]'s breach of contract and the resulting damage." *E. Elec. Corp. of N.J. v. Shoemaker Const. Co.*, 657 F. Supp. 2d 545, 556 (E.D. Pa. 2009). The Access Defendants' argument, of course, assumes that the Court has granted the rest of the Access Defendants' Motion for Summary Judgment. Because the Court has not done so, the Court will deny summary judgment on this claim.

## V. CONCLUSION

For the reasons outlined above, the Court will grant in part and deny in part the Access Defendants' Motion for Summary Judgment, (Doc. 81). A separate Order follows.

---

[15] The Access Defendants also devote a section of their brief to argue that all of Plaintiff's breach of contract claims are untimely because Plaintiff failed to submit change orders in accordance with the contract. (Doc. 82 at 43-45). The Court has already addressed this argument, where relevant, as it pertains to the individual claims above and will not address it any further here.

Robert D. Mariani
United States District Judge